## CURTISS AEROPLANE & MOTOR CORPORATION v. UNITED AIRCRAFT ENGINEERING CORPORATION.

(Circuit Court of Appeals, Second Circuit. April 1, 1920.)

No. 143.

**1. Patents ⟨⟩258—Sale by licensed manufacturer not infringement.**

Contracts made during the war by which complainant, a manufacturer of aeroplanes sold to the British government, through the Imperial Munitions Board of Canada, a large number of aeroplanes, engines, and parts, and also its Canadian plant and materials, with license to manufacture under all its Canadian patents, to use any future inventions it might acquire, and an agreement to promote such manufacture, receiving therefor a large consideration and a royalty on engines made, *held* to vest the British government with absolute title to all planes so sold or manufactured, free from the monopoly of any patents owned by complainant, and the sale by such government or by purchasers from it, in the United States, of planes so manufactured or bought, which were left on hand at the close of the war, *held* not an infringement of complainant's United States patents.

**2. Patents ⟨⟩206—Unrestricted grant to manufacture carries right to use and sell articles manufactured.**

Unless a grant by owner of patent transfers right to make, use, and sell, grant creates a license only; but an unrestricted grant by a patentee of the right to manufacture the patented article carries with it the right to use and sell the articles so manufactured.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the Curtiss Aeroplane & Motor Corporation against the United Aircraft Engineering Corporation. Decree for defendant, and complainant appeals. Affirmed.

The plaintiff is a corporation organized under the laws of the state of New York, and has its principal place of business in Buffalo; but it also has a regular and established place of business in New York City, within the Southern district of New York. The defendant is likewise a corporation organized under the laws of New York, and maintains its office in the city of New York.

John C. Kerr and Drury W. Cooper, both of New York City, for appellant.

Arthur Johns, of New York City (Clifford E. Dunn, C. A. L. Massie, and Ralp L. Scott, all of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ROGERS, Circuit Judge. [1] This suit is brought under the Patent Laws of the United States for the alleged infringement by defendant of thirteen patents issued by the United States. The patents so said to be infringed are named in the margin.[1] The defendant is charged with selling and offering for sale in the United States aeroplanes manufactured in Canada pursuant to certain agreements between plaintiff and the British government; the Canadian manufacture having been conducted by a corporation created by that government for that purpose. The total number of claims involved is 80. All the patents involved are for improvements in aeroplanes, and are capable of conjoint use, and are so used by plaintiff and defendant.

The bill of complaint alleges that all of the patents referred to were, by instruments in writing duly executed and recorded in the United States Patent Office, assigned to the plaintiff, and that plaintiff is the sole and exclusive owner of each and all of them. It also alleges that defendant has infringed each and all of said patents by offering for sale, selling, and using within the Southern district of New York, as well as elsewhere within the United States, aeroplanes, each of which embodies the improvements claimed in each and all of said patents. It contains the following statement:

"That the plaintiff, Curtiss Aeroplane & Motor Corporation, has developed at large expense, and produced in large quantities, aeroplanes of a distinctive type known throughout the aeroplane industry and among aviators as the Curtiss JN–4 machine; that such machine and the various parts thereof are embodiments of the several inventions of the letters patent heretofore set forth; that the defendant is now selling in the United States aeroplanes known as Canadian Curtiss or Canadian JN–4 machines, which are copies, in form, appearance, and mechanical details, of plaintiff's JN–4 machine, all in violation of plaintiff's rights under such patents and in an unfair and unlawful manner."

The bill prays an injunction and asks for an account of profits and damages resulting from the infringement which it alleges, and that any damages assessed may be tripled. The court below dismissed the bill for lack of merit, with costs to defendant.

The plaintiff, prior to the beginning of the World War, was engaged in the manufacture of aeroplanes, and as a result of the war its business was greatly extended. In 1916 the plaintiff entered into certain contracts with the British government from which it received some $4,000,000. The contract into which the plaintiff entered with the British government is found in two separate documents: First, the agreement of November 20, 1916, with the annexed schedule, which

[1] No. 1,010,842, granted December 5, 1911, to F. W. Baldwin; No. 1,011,106, granted December 5, 1911, to A. G. Bell et al.; No. 1,170,965, granted February 8, 1916, to Glenn H. Curtiss; No. 1,195,142, granted August 15, 1916, to Henry Kleckler; No. 1,246,024, granted November 6, 1917 to Henry Kleckler; No. 1,246,026, granted November 6, 1917, to Henry Kleckler; No. 1,246,028, granted November 6, 1917, to Henry Kleckler; No. 1,290,004, granted December 31, 1918, to P. G. Zimmerman; No. 1,290,005, granted December 31, 1918, to P. G. Zimmerman; No. 1,290,838, granted January 7, 1919, to Henry Kleckler; No. 1,291,678, granted January 14, 1919, to Henry Kleckler; No. 1,294,477, granted February 18, 1919, to Henry Kleckler; No. 1,298,625, granted March 25, 1919, to P. G. Zimmerman.

is a contract of sales; second, the simultaneous agreement of the same date, which is an agreement on the plaintiff's (the seller's) part to promote the manufacture by the British government (the buyer) of the aeroplanes and engines of the type sold. The record contains a third document, dated December 6, 1916. The parties to this document are the Curtiss Aeroplane & Motors, Limited, of the first part, and the Canadian Acroplanes, Limited, of the second part. The Curtiss Aeroplane & Motors, Limited, is a subsidiary company organized in Canada, in which the plaintiff owned 83 per cent. of the outstanding capital stock; and the Canadian Aeroplane, Limited, is a company which the Imperial Munitions Board had caused to be incorporated to take over the plant of the Curtiss Aeroplanes & Motors, Limited.

The document above referred to as a contract of sales was executed on behalf of his Britannic majesty's government by J. P. Morgan & Co., agents. That document contains the statement that the British government has contracted to purchase from the plaintiff, and the seller has contracted to manufacture and sell to the buyer, at the price, and subject to the terms and conditions specified, the "sellers JN–4A type aeroplane, each equipped with one seller's OX5 type 90 H. P. engine, spare parts for such aeroplanes, blueprints and such aeroplanes, seller's OX5 type 90 H. P. engine, and spare parts for such engines." It also provides for the sale of a specified number of additional engines and of sets of spare parts of such engines.

The second document of those referred to was executed by his Britannic majesty's government, acting by the Imperial Munitions Board of Canada, and it provides in its first clause as follows:

"The seller agrees to cause to be sold and delivered to the buyer within ten (10) days of the date of the fixing of the purchase price therefor, as hereinafter provided, and the buyer agrees to accept and pay for, all of the tools, machinery, drawings, patterns, jigs, etc., of the Canadian company for use in the manufacture of seller's JN–4 aeroplanes, including raw materials and material manufactured and in process of manufacture at said Toronto plants for use in the manufacture of such aeroplanes, the buyer to pay therefor to the Canadian company. * * * "

It provides in its third clause as follows:

"The seller agrees that at the option of the buyer it will grant or cause to be granted to the buyer, as part of the consideration moving from the seller to the buyer for this agreement, the exclusive right and license under any and all Canadian patents and applications for Canadian patents now or at any time hereafter owned by the seller or the Canadian company, and any further inventions now or hereafter owned and controlled by them or either of them embodying changes in or improvements of seller's JN–4 type aeroplanes and of seller's type engines, to manufacture such aeroplanes and /or engines within the Dominion of Canada, for sale to or use by the British government or the government of any of its possessions, but not for manufacture, use, or sale otherwise."

The plaintiff alleges that it was not within the contemplation of the parties to the agreements made between plaintiff and the British government, or within plaintiff's intention or by its permission, that the aeroplanes were to be sold or used by the public, or for other than war purposes, or in the United States. These allegations are denied

absolutely in an affidavit presented by one who was connected with the Imperial Munitions Board of Canada, which made the contracts, and who was the superintendent of aeronautical supplies; this department being a branch of the Air Ministry in Great Britain and responsible only to the government of Great Britain. His affidavit states that in entering into the contracts made with the plaintiff it was understood that the property manufactured or otherwise acquired by the munitions board should become the absolute property of the board, to be disposed of as it should see fit. This was purely a war organization, and as soon as hostilities ceased the board proceeded to sell off everything controlled by it, including lands, buildings, aeroplanes, motor transports, motorboats, and thousands of patented articles of all kinds, including those complained of by the plaintiff.

It is admitted that the JN–4 aeroplanes which are said to infringe were made in Canada for the British government under the agreements to which reference has been made, and that after the war defendant purchased them from the British government, and, as it appears, is now proceeding to sell them in the United States. It is also admitted that the defendant has announced its intention of establishing warehouses at various parts of the United States, and such warehouses have been established already by it in New York and Chicago, in order that it may supply individuals and companies with the spare parts of air planes of all kinds and descriptions and all standard parts which may be used in their manufacture and development, including the supplying of standard air plane parts for the particular Canadian planes herein involved.

The defendant corporation has a capital of $500,000, and as the record shows, it is in the management of men of character and of excellent business standing. The chief engineer of the Curtiss Aeroplane & Motors Limited, of Canada, states in his affidavit that "their staff of engineers is composed of the leading aeronautical engineers of this country." It was organized on November 22, 1918, which was prior to the signing of the armistice, and was established, it is said, with the idea of organizing an aeronautical engineering and consulting corporation of the highest type. At the time of its incorporation there was no intention of purchasing any of the property of the Imperial Munitions Board of Canada. It appears that after the armistice, and when defendant was first approached on the subject of the purchase of some part of the aeroplane equipment of the British government, which was located in Canada, it declared through its president that it was not interested in any extent whatsoever. In January, 1919, the Imperial Munitions Board sold a number of its machines to the Canadian government, and the remainder of its equipment was sold to F. G. Ericson, a citizen of the United States, at the time a resident of Toronto, Canada. They were purchased by Ericson in his own name, but as matter of fact he was acting for defendant. He is a member of the Society of Automotive Engineers and a Fellow of the Aeronautical Society of Great Britain, and had been for nine years engaged in the development of aeronautics. In 1915 he was appointed chief engineer of the Curtiss Aeroplane & Motors, Limited, of Canada,

and when that concern was taken over by the Canadian Aeroplanes, Limited, he became its chief engineer. Before the sale to Ericson was made he informed the director of aviation of the Imperial Munitions Board what disposition he intended to make of the property upon acquiring it, and that he expected to sell a few of the planes in Canada, but that most of them would be sold for commercial purposes in the United States, and that he expected to establish a depot for such sales in or near Baltimore. With this information in its possession the Imperial Munitions Board made the sale, and made it entirely without restriction or condition, and gave Ericson full right to sell and dispose of the property whenever and wherever he might see fit. It may be remarked in passing that the counsel of the munitions board, who is referred to in one of the affidavits "as one of the most prominent attorneys in Canada," furnished that board with an opinion in which he denied the claims set up by the plaintiff as to the rights which the British government had under the agreements already referred to.

The bill charges no infringement by manufacture, nor does it raise the question when assembling ends and manufacturing begins. It deals with nothing but the right to bring into the United States certain JN-4's which the plaintiff gave permission to make, and in the making of which it aided, and for every one of which it has been compensated. The right to bring these machines into the country is the sole question with which the bill deals.

An aeroplane has been said to be the most mobile article manufactured, and it is not confined by geographical boundaries. It is susceptible of use anywhere in the world. As was said at the argument, aeroplanes were used by the British government, not only in England and Canada, but over the battle fields of Belgium and France, in Egypt, Palestine, Mesopotamia, Northern Russia, South Africa, and indeed wherever hostilities existed. In the very nature of things, and from the language used in the agreements, it is evident that the contracting parties contemplated such widespread use. After this country entered the war, the aviation fields in Texas and in other states were placed at the disposal of the British authorities and were actually used by them as training fields for Canadian aviators. It does not appear in this record whether any of these Canadian JN-4 planes were then brought into the United States for use by Canadian aviators on our aviation fields, who were there undergoing training. If, however, such planes were then brought into the United States, and if they contained the plaintiff's manufactured engines, it would be difficult to believe that any one would seriously contend that their introduction involved any violation of the plaintiff's patents.

The plaintiff and the British government alike understood and intended that the aeroplanes to be manufactured by that government as well as those to be supplied to it by the plaintiff were to become the absolute property of the government, and were to be disposed of as the latter should see fit. The express language of the contract is that the aeroplanes and other articles should "become and be the absolute property of the British government."

The plaintiff, in becoming the owner of the patents in suit, acquired the exclusive privilege of making, using, and vending, and of authorizing others to make, use, and vend the subject-matter of the respective inventions without its permission. Bloomer v. McQuewan, 14 How. 539, 549, 14 L. Ed. 532. The exclusive right of an inventor in his invention was not recognized by the common law, which conferred no such monopoly upon him. The right in the United States rests upon article 1, § 8, of the Constitution, which gives to Congress the power to promote the progress of science and the useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries. While a patent is undoubtedly a monopoly it belongs to a class made legal by the constitutional provision referred to.

It is important to determine what right or rights passed to the British government under the agreements which it entered into with the plaintiff. As we have seen, the owner of a patent has three distinct rights, which he can dispose of either together or singly: (1) The right to make the article. (2) The right to use it. (3) The right to sell it. Waterman v. Mackensie, 138 U. S. 252, 11 Sup. Ct. 334, 34 L. Ed. 923. A grant which does not transfer all these rights is a license. So, also, is the right to make, use, and sell the article for specified purpose only. Gamewell Fire-Alarm Telephone Co. v. Brooklyn (C. C.) 14 Fed. 255; Bogart v. Hinds (C. C.) 25 Fed. 484. See 22 Am. & Eng. Encyc. of Law, 430.

That the British government secured the right to manufacture the aeroplanes, and the engines as well, is not open to doubt. In the fourth clause of the agreement of sale the plaintiff bound itself from time to time to furnish the British government all information useful to it "in the building of such aeroplanes and engines, including engineering data, blueprints in detail of such aeroplanes and engines," etc. The sixth clause of that agreement reads as follows:

"The seller agrees that at the request of the buyer from time to time it will send to the plant to be established by the buyer in the Dominion of Canada a competent engineer, familiar wtih the design, construction, and methods of manufacture of such aeroplanes and/or engines, to assist and advise the buyer in the manufacture thereof. Such engineer shall report his observations and recommendations to the general manager of the plant so to be established by the buyer, or any other person designated by it for that purpose, and shall continue in the exclusive employment of the buyer during its pleasure, receiving compensation from the buyer at a rate not to exceed fifty dollars ($50) per week during the time of such continuous and exclusive employment."

And the seventh clause provides that the British government shall pay "on each such engine manufactured" by it a specified sum, adding:

"And such exclusive right and license shall be granted only upon the further condition that the buyer shall pay to the seller," etc.

There is much more in the agreements which proves what the plaintiff's intention was respecting the right of the British government to manufacture, but it is not necessary to set it forth herein. It does not in any way restrict or qualify the right of the British government.

[2] That government plainly acquired the right under its license to make. Did it also have the right to use and to vend? The answer to this question depends upon whether the authorization to make was general and unrestricted or subject to qualification and conditions, as to the disposition of the planes by the British government. The agreements will be searched in vain for any restriction or condition as to the right to use or to vend; and in the absence of such restriction we understand the law to be that the British government obtained a full and unqualified right to use and sell the planes and engines, and that this right passed to all subsequent purchasers, and therefore to this defendant. No American or British decision asserting a contrary doctrine is known to us.

The plaintiff relies on certain cases, but an examination shows that they are plainly distinguishable, and do not support the plaintiff's contention. The cases upon which it relies belong to one or the other of two classes: (1) Those in which there has been a sale of a patented article, or a license to manufacture, but accompanied by explicit and unequivocal restrictions as to the time, or place, or manner of using the article so sold or licensed, or as to the ultimate disposal thereof. Dickerson v. Matheson, 57 Fed. 524, 6 C. C. A. 466; Dickerson v. Tinling, 84 Fed. 192, 28 C. C. A. 139; Dickerson v. Sheldon, 98 Fed. 621, 39 C. C. A. 191. (2) Those in which there has been no participation whatever by the owner of the patent, either as a party or as a privy, in the putting out of the article which is alleged to infringe. Boesch v. Graff, 133 U. S. 697, 10 Sup. Ct. 378, 33 L. Ed. 787; Featherstone v. Ormonde Cycle Co. (C. C.) 53 Fed. 110; Daimler v. Conklin, 170 Fed. 70, 95 C. C. A. 346, 27 L. R. A. (N. S.) 534. And if a patentee retains title to the patented machine, which was not done in this case, he may restrict its manner of use, in the lease or other contract. United States v. United Shoe Machinery Co., 247 U. S. 32, 58, 38 Sup. Ct. 473 (62 L. Ed. 968). In Chaffee v. Boston Belting Co., 22 How. 217, 223 (16 L. Ed. 240), the Supreme Court said:

"When the patented machine rightfully passes to the hands of the purchaser from the patentee, or from any other person by him authorized to convey it, the machine is no longer within the limits of the monopoly. * * * By a valid sale and purchase, the patented machine becomes the private individual property of the purchaser, and is no longer protected by the laws of the United States. * * *"

In Bloomer v. Millinger, 1 Wall. 340, 350 (17 L. Ed. 581), the court said:

"Patentees acquire the exclusive right to make and use, and vend to others to be used, their patented inventions for the period of time specified in the patent; but when they have made and vended to others to be used one or more of the things patented, to that extent they have parted with their exclusive right. They are entitled to but one royalty for a patented machine, and consequently, when a patentee has himself constructed the machine and sold it, or authorized another to construct and sell it, or to construct and use and operate it, and the consideration has been paid to him for the right, he has then to that extent parted with his monopoly, and ceased to have any interest whatever in the machine so sold or so authorized to be constructed and operated."

The purchaser of a patented article from a territorial licensee (one whose rights are limited to a restricted territory) may, unless there is a specific agreement to the contrary, use the article so purchased outside of the territory without interference from the patentee. The article is no longer within the monopoly of the patentee, and the purchaser can use it anywhere. This principle was announced in Adams v. Burke, 17 Wall. 453, 456 (21 L. Ed. 700), where it was said:

"It seems to us that, although the right of Lockhart & Seelye to manufacture, to sell and to use these coffin lids was limited to the circle of 10 miles around Boston, that a purchaser from them of a single coffin acquired the right to use that coffin for the purpose for which all coffins are used; that, so far as the use of it was concerned, the patentee had received his consideration, and it was no longer within the monopoly of the patent. It would be to ingraft a limitation upon the right of use· not contemplated by the statute, nor within the reason of the contract to say that it could only be used within the 10-mile circle."

And see, to the same effect, Hobbie v. Jennison, 149 U. S. 355, 13 Sup. Ct. 879, 37 L. Ed. 766; Keeler v. Standard Folding Bed, 157 U. S. 660, 15 Sup. Ct. 738, 39 L. Ed. 848. In the case last cited the court said:

"Upon the doctrine of these cases we think it follows that one who, buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place. * * * The conclusion reached does not deprive a patentee of his just rights, because no article can be unfettered from the claim of his monopoly without paying its tribute. The inconvenience and annoyance to the public that an opposite conclusion would occasion are too obvious to require il-. lustration."

If a patentee or his assignee sells a patented article, that article is freed from the monopoly of any patents which the vendor may possess. If the thing sold contains inventions of several United States patents owned by the vendor, the article is freed from each and all of them; and if the vendor has divided his monopoly into different territorial monopolies, his sale frees the article from them all. If the vendor's patent monopoly consists of foreign and domestic patents, the sale frees the article from the monopoly of both his foreign and his domestic patents, and where there is no restriction in the contract of sale the. purchaser acquired the complete title and full right to use and sell the article in any and every country. This doctrine was recognized by Judge Wallace in the Circuit Court for the Southern District of New York in 1885, in Holiday v. Mattheson, 24 Fed. 185. That case raised the question whether the owner of a patent in the United States for an invention, and who had sold the patented article in England without restrictions or conditions, could treat as an infringer one who had purchased the article in England of a vendee of the patentee, and could restrain him from using or selling the article in the United States. In deciding the question adversely Judge Wallace said:

"When the owner sells an article without any reservation respecting its use, or the title which is to pass, the purchaser acquires the whole right of the vendor in the thing sold, the right to use it, to repair it, and to sell it to others; and second· purchasers acquire the rights of the seller, and may do with the article whatever the first purchaser could have lawfully done if

he had not parted with it. The presumption arising from such a sale is that the vendor intends to part with all his rights in the thing sold, and that the purchaser is to acquire an unqualified property in it; and it would be inconsistent with the presumed understanding of the parties to permit the vendor to retain the power of restricting the purchaser to using the thing bought in a particular way, or in a particular place, for a limited period of time, or from selling his rights to others. It is quite immaterial whether the thing sold is a patented article or not, or whether the vendor is the owner of a patent which gives him a monopoly of its use and sale. If these circumstances happen to concur, the legal effect of the transaction is not changed, unless by the conditions of the bargain the monopoly right is impressed upon the thing purchased; and if the vendor sells without reservation or restriction, he parts with his monopoly so far as it can in any way qualify the rights of the purchaser."

And see Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co. (C. C.) 40 Fed. 580.

Counsel for plaintiff relies strongly upon Société Anonyme des Manufactures de Glaces v. Tilgman's Patent Sand Blast Co., L. R. 25 Ch. Div. 7. That case, however, is readily distinguishable in its facts. There were two patents for the same invention, one Belgian and one British. The two patents were owned by the same concern. A third party had purchased the patented article in Belgium, and had then undertaken to import his purchase into England. The owner of the British patent had not manufactured the article, nor sold it, nor in any way authorized the purchaser to bring it into England, and therefore was not estopped from enforcing his rights against the purchaser. The owner of the patent had granted to the Belgian Société Anonyme a mere ordinary license to operate under the Belgian patent, and the court held that, inasmuch as the relationship was that of ordinary licensor and licensee, the Belgian product was not immune from infringement within Great Britain. In the course of his opinion in that case Cotton, L. J., however, said:

"When an article is sold without any restriction on the buyer, whether it is manufactured under either one or the other patent, that, in my opinion, as against the vendor gives the purchaser an absolute right to deal with that which he so buys in any way he thinks fit, and of course that includes selling in any country where there is a patent in the possession of and owned by the vendor."

The extract quoted fits the facts of this case. The plaintiff herein as the original vendor gave to the British government, as purchaser, an absolute right to deal with that which it purchased in any way it thought fit, and defendant herein derives its right from that government to bring the aeroplanes into the United States in the manner it did, and the plaintiff is without ground of complaint. As the plaintiff has already been paid for these aeroplanes the full price it asked, it is no longer concerned about the price at which the article is sold, or whether the article is kept in Canada, or in Great Britain, or in the United States. We may summarize our conclusions:

It is admitted that, if the aeroplanes which are alleged to infringe had been built in Canada under a limited license, or under a Canadian patent, and then brought into the United States, infringement would have been made out. But that is not this case.

It appears that the aeroplanes complained of were manufactured under a license from the plaintiff and with the latter's active assistance, and that they contain engines furnished by the plaintiff with the intent that they should be so used.

It appears that the plaintiff has been paid a sum in excess of $4,-000,000 for the aeroplanes and engines which plaintiff sold or agreed might be manufactured.

It appears that the license under which the aeroplanes were manufactured contained no restriction or limitation as to time, or place, or manner of use of the aeroplanes, nor as to the ultimate disposition which might be made of them, and that they were therefore freed from the monopoly of the plaintiff's patents.

The decree appealed from is in all respects affirmed, with the costs of both courts.