**SANOFI, S.A. and American Home Products Corporation, Plaintiffs,**

v.

**MED–TECH VETERINARIAN PRODUCTS, INC., J.A. Webster, Inc., as Agent for Med-Tech Veterinarian Products, A.J. Buck & Son, Inc., as Agent for Med-Tech Veterinarian Products, Inc., J.A. Webster, Inc., and A.J. Buck & Son, Inc.**

Civ. No. 82–1302.

United States District Court,
D. New Jersey.

June 15, 1983.

Gerard J. Weiser, Weiser, Stapler & Spivak, P.C., Philadelphia, Pa., Benjamin A. Levin, Cherry Hill, N.J., for plaintiff Sanofi, S.A.

William J. Fiore, Meyner & Landis, Newark, N.J., Morris Relson, Darby & Darby, P.C., New York City, for plaintiff American Home Products Corp.

Richard Catenacci, Connell, Foley & Geiser, Newark, N.J., James H. Laughlin, Jr., Benoit, Smith & Laughlin, Arlington, Va., for defendants.

## AMENDED OPINION

SAROKIN, District Judge.

This matter, which is before the Court on application of plaintiffs for a preliminary injunction, presents a novel and difficult question arising under the patent laws of the United States. Plaintiff, Sanofi, S.A., is located and incorporated in France. The company manufactures pharmaceutical products and holds patents in the United States and in Canada for the generic drug, acepromazine maleate, a tranquilizer and anti-emetic used in the United States for the treatment of animals. In September, 1959, Sanofi entered into an agreement with plaintiff American Home Products,[1] which conferred upon the company

the right to manufacture, sell or use in Canada [acepromazine maleate] and pharmaceutical products containing [acepromazine maleate] either alone or associated with other active products in injection or oral form for veterinary use.

The contract further provided:

This right to manufacture, use or sell [acepromazine maleate] and pharmaceutical products containing [acepromazine maleate] in Canada will be an exclusive right and limited to products for veterinary use.

Under the contract, which incorporated provisions of an earlier agreement between the companies, American Home Products was obligated to inform Sanofi of any infringements of the patent. Sanofi, in turn, agreed that in exchange for the assistance of American Home in protecting the patent, American Home would not be required to bear any expense in providing the required assistance. The parties further agreed that American Home would compensate Sanofi for rights conferred by the contract by payment of a royalty based on sales of the patented product.

In January, 1963, a letter agreement was entered into by the parties which extended to American Home "the right *to sell* [acepromazine maleate] in the veterinary field in the United States under the same contractual conditions as exist for the Canadian sales." (emphasis supplied).

In July, 1981, and in September, 1981, Medico Industries, Inc., a Delaware corporation with its principal place of business in Kansas, placed two separate orders with a chemical broker, Flavine International, Inc., of Northvale, New Jersey, for the purchase of acepromazine maleate in bulk form. Because it was alleged by plaintiffs that fraud occurred in connection with these transactions, a hearing was held by this court. From the evidence adduced at that hearing, the following findings of fact are made.

Flavine, International, Inc., did a considerable amount of business with Medico, which processed the acepromazine maleate sold by the defendants, distributors of the product. After Medico placed the first order for the acepromazine maleate, Flavine sought out sources for the material. Flavine ultimately contacted Flavine GmbH, a company located in Germany engaged in the identical business of Flavine International, for its assistance in procuring the product. Although Flavine International sometimes referred to Flavine GmbH as a "sister company", there was no evidence of

---

1. For convenience, the Court has referred to Sanofi as the party to the agreement with American Home. The agreement was actually entered into by Clin-Byla S.A., which was Sanofi's name prior to a series of mergers beginning in 1971. The substitution of Sanofi for Clin-Byla has no effect on the analysis of the issues in this case because Sanofi is the record holder of the patent.

any formal relationship between the companies except that they had a history of doing business together. Flavine GmbH ascertained that the acepromazine maleate could be obtained from Sempa-Chimie of Paris, France. Sempa-Chimie was a wholly-owned subsidiary of Clin Midy S.A., which in turn was a wholly-owned subsidiary of plaintiff Sanofi.

The court specifically finds that neither Medico nor Flavine International knew of any patent or any license pertaining to acepromazine maleate and were unaware of any restrictions upon the manufacture, sale or use of the chemical in the United States. Furthermore, there was no attempt made by Medico to conceal its role in the acquisition of the chemical, nor did the company authorize or have knowledge of any misrepresentations which may have been made in connection with the acquisition of the chemical from Sempa-Chimie.

On the other hand, the court finds that representatives of Sempa-Chimie did advise the Germany-based Flavine company of the existence of the United States patent and sought assurance that the chemical was not to be purchased on behalf of a customer in the United States. Flavine GmbH, in response to the inquiry of Sempa-Chimie, represented by Telex dated July 24, 1981, that the chemical would be destined for South America. In reliance upon that representation, Sempa-Chimie processed the order of Flavine GmbH. A subsequent sale was made in reliance upon the same representation with the expectation that the goods would not be sold or utilized in the United States. Therefore, the court specifically finds that there was a fraudulent misrepresentation which induced Sempa-Chimie to part with its product. The court further finds that, notwithstanding the misrepresentation, Medico Industries was a bona fide purchaser for value without any knowledge of the misrepresentation, and without any knowledge of any restriction on the sale or use of the chemical in the United States.

Even if there were some relationship between Flavine GmbH and Flavine International, their actions as brokers are not binding upon Medico, and any fraud on the part of the brokers will not be imputed to Medico. Nothing in the documents authored by Sempa-Chimie would have placed Medico on notice of any restrictions on sale or use in the United States, even assuming that the documents initiated by Sempa-Chimie would have been passed on to the customer by either of the Flavine companies. The goods, rather than being delivered to South America, were delivered to Medico in the United States and were paid for by Medico.

The Court further finds that Sempa-Chimie advertised in a publication generally circulated in the United States, that through the SST corporation, acepromazine maleate was available for purchase. Although there is no testimony that Medico in any way relied upon the advertisement, the ad is further evidence of Sempa-Chimie's failure to publicize the restrictions, if any, which it claims pertained to the sale of the chemical. Therefore, the court rejects the contention of plaintiff that the position asserted by defendants is barred by the fraud of the defendants or their representatives. Neither defendants nor any of their representatives participated in the fraud, knew of it, nor authorized it, and although the court finds that the fraud occurred, it was not committed by Medico or anyone acting on its behalf. In no event can the fraud and misrepresentation be imputed to those defendants who remain before the court today. Therefore, the question that this court must determine is whether the patentee or licensee of a patent on a product has a right to enjoin the sale of that product by one who has purchased it from the patentee abroad without any restrictions and seeks to sell it in this country.

DISCUSSION OF THE LAW

■ In deciding whether to grant the application of plaintiffs for a preliminary injunction, the court must consider four factors: (1) whether the moving party has a reasonable probability of eventual success in the litigation; (2) whether the movant will suffer irreparable harm if relief is not granted; (3) the possibility of harm to other

interested persons from the grant or denial of the injunction; and (4) the public interest. *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137 (3rd Cir.1982). It is the movant who has the burden of satisfying the court of the reasonable probability of success on the merits and of the likelihood of irreparable harm. *Id.* at 1143. The failure to carry that burden must necessarily result in the denial of the preliminary injunction application. *Id.*

■ Plaintiffs advance three arguments with respect to the merits of their case. First, they contend that as a matter of law the sale abroad by the United States patent holder of the patented product is not a waiver of the right of the patent holder to exclude the purchaser from bringing the product into this country. As an alternative position, plaintiffs argue that even if an unrestricted sale abroad by the patentee does constitute a waiver of the patentee's right to exclude the product from entering this country, the waiver of that right has no effect upon the outstanding rights of an exclusive licensee. Plaintiffs contend that American Home was given an exclusive license to sell acepromazine maleate here, that American Home did not consent to Medico's importation of the chemical, and that therefore Medico's actions constituted infringement. Plaintiffs' final position is that Medico practiced a deception in obtaining the chemical from Sanofi and that defendants should not be permitted to benefit from that deception.

As the Court has already found, plaintiffs' last position is not meritorious because Medico, in ordering the product for importation, acted in good faith, without notice of restrictions, and without knowledge of Flavine GmbH's misrepresentation. Nevertheless, the Court must still consider the soundness of plaintiffs' first two arguments.

■ Plaintiffs' first argument, that a sale abroad by a United States patent holder does not give the purchaser the right to bring the product into this country, cannot be accepted under the circumstances of this case. The reason for this conclusion requires analysis of the interest in the patent held by Sanofi and the interest conveyed to American Home. Under the patent laws of this country, the patent holder has the exclusive right to make, use and sell his invention throughout the United States. *Waterman v. Mackenzie,* 138 U.S. 252, 255, 14 S.Ct. 334, 335, 31 L.Ed. 923 (1891). This exclusive right may be assigned to another. *Id.* Therefore, if the patentee conveys to another in writing the whole patent, comprising the exclusive right to make, use and sell the invention throughout the United States, or conveys an undivided part or share of that exclusive right, or transfers the exclusive right under the patent within and throughout a specified part of the United States, then the transfer will be properly characterized as an assignment. *Id.* Any transfer of fewer rights than these is a license and not an assignment. *Id.*

■ Plaintiff Sanofi transferred to American Home certain rights that the patentee possessed. Specifically, the contract provides American Home with the right *to sell* acepromazine maleate in the United States under the same contractual conditions as exist for Canadian sales. Under the Canadian agreement, American Home has the right to sell the product in Canada, a right that is exclusive and limited to products for veterinary use. Because Sanofi transferred less than its entire right in the patent to American Home, the transfer must be characterized as a license and not an assignment.

■ There are two types of licenses, however, exclusive and non-exclusive. A non-exclusive license confers upon the licensee a mere privilege that protects him from a claim of infringement by the owner of the patent. *Western Electric Co. v. Pacent Reproducer Corporation,* 42 F.2d 116 (2d Cir. 1930). The non-exclusive licensee has no property interest in the patent monopoly, nor any contract with the patent owner that others shall not practice the invention. *Id.* at 118. The patent owner who grants a non-exclusive license to another is not precluded from further licensing the product,

and may freely tolerate infringement without violating the rights of the patent licensees. *Id.*

■ An exclusive licensee, on the other hand, has the promise of the patent owner that others shall be excluded from practicing the patent within the field of use for which the license has been given. *Id.* Exclusive licensees have the right to enjoin acts of infringement, and, because the presence of the patentee is usually necessary to pursue such relief, may compel the patentee to become a party to the lawsuit. *Independent Wireless Telegraph Company v. Radio Corporation,* 269 U.S. 459, 471, 46 S.Ct. 166, 170, 70 L.Ed. 357 (1926). The patentee has no more right to practice his patent in a field of use where an exclusive license has been given, than does a stranger. *Littlefield v. Perry,* 88 U.S. 205, 223 (21 Wall.), 22 L.Ed. 577 (1874). Therefore, if the exclusive license has been violated by the patentee, the patentee may be sued for infringement. *Id.; Research Frontiers, Incorporated v. Marks Polarized Corporation,* 290 F.Supp. 725, 727 (E.D.N.Y.1968).

■ Analysis of the agreement entered into between Sanofi and American Home compels the conclusion that American Home holds an exclusive license to sell acepromazine maleate in this country for veterinary purposes, the only purposes for which the drug has received the approval of the Food and Drug Administration. The contract with American Home provides that the company has the right *to sell* in the veterinary field in the United States under the "same contractual conditions as exist for the Canadian sales." The contract governing Canadian sales specifically provides that the right of American Home to sell in Canada is "exclusive". Therefore, when the two agreements are examined together, it is apparent that American Home has the exclusive right to sell Sanofi's patented product, acepromazine maleate, in this country for veterinary purposes.

■ Having determined that Sanofi transferred to American Home the exclusive right to sell the patented product in this country, the court must consider Sanofi's argument that it is entitled to enjoin defendants from selling the product in the United States because Sanofi's sale abroad did not confer upon the purchaser the right to bring the product into this country. In support of its argument, Sanofi cites *Boesch v. Graff,* 133 U.S. 697, 10 S.Ct. 378, 33 L.Ed. 787 (1890), and *Griffin v. Keystone Mushroom Farm, Inc.,* 453 F.Supp. 1283 (E.D.Pa. 1978).

In *Boesch,* the plaintiff held a United States patent for certain burners. Under a German prior user statute, an individual named Hecht, had the right to sell the burners in Germany. Hecht sold the burners to defendants, who imported them into the United States and began selling them here. Plaintiff brought suit to enjoin the further sale of the burners in this country. In opposing the injunction, defendants argued that they had purchased the burners from one who had a right to sell them in Germany and that the sale thus freed the products from the patent monopoly of plaintiff. The Supreme Court, rejecting defendants' argument, held:

> The right which Hecht had to make and sell the burners in Germany was allowed him under the laws of that country, and purchasers from him could not be thereby authorized to sell the articles in the United States in defiance of the rights of patentees under a United States patent. A prior foreign patent operates under our law to limit the duration of the subsequent patent here, but that is all. *The sale of articles in the United States under a United States patent cannot be controlled by foreign laws.*

133 U.S. at 703, 10 S.Ct. at 380. (emphasis supplied).

*Boesch* is distinguishable from this case. In *Boesch,* it was not the patentee who made the sale abroad. In fact, it was not even a licensee of the patentee who made the sale. Rather, the seller was one who had a right to sell by operation of the patent laws of Germany, which provided that patents do not affect persons who, at the time of the patent application, were

already making use of the invention. Under the circumstances of *Boesch*, the patentee neither received compensation for the use of his invention, nor consented to its importation into this country. Here, however, it was the patentee that made and profited from the initial sale abroad, and, despite having had the opportunity to do so, it placed no restrictions in the sales contract upon further disposition of the product by the purchaser.

For similar reasons, *Griffin*, also cited by Sanofi, is inapposite. In *Griffin*, plaintiff held patents in the United States and in Italy for composting machines. Plaintiff had granted to Celeste Carminati the exclusive license to make, sell and use the invention in Italy. Carminati sold to defendant three of the machines. One of them was used by defendant in its business in this country and the other two were sold by defendant. In opposing plaintiff's suit for infringement, defendant made two arguments. First, it contended that sale of the product by the Italian licensee released the product from the patent monopoly. This argument was rejected by the court, relying upon *Boesch* for support. Defendant next argued that plaintiff was not entitled to relief because it had already received a royalty from the Italian licensee for the sale of the product to defendant, and to allow a remedy for bringing the product into this country would result in a double recovery. The court rejected this argument as well, noting that plaintiff had two rights at stake, one under Italian patent law and the other under United States patent law, and that the sale or use of the patented product potentially infringed both sets of rights and therefore potentially constituted two separate torts upon which recovery could be based.

*Griffin* too is distinguishable from this situation because here the sale abroad was made by the patent holder itself without restriction. This distinction is of crucial significance. In this case, were the purchaser to search the patent records in the United States, it would find that the holder of the patent is the very party which made the sale without restriction. Though the goods were sold in France, no patent was held on the goods in that country. Therefore, assuming that Sanofi had a right to enjoin the reselling of the goods in this country, it waived that right by not placing any written restrictions upon the purchaser at the time of sale. Strong analogy for this result is found in *Holiday v. Mattheson*, 24 F. 185 (C.C.N.Y.1885).

In *Holiday*, the United States patent holder sold the patented article to a party in England without restrictions or conditions. The English purchaser then sold the product to another who sought to resell the product in this country. In refusing to enjoin the sale of the product in the United States, the court held:

> When the owner sells an article without any reservation respecting its use, or the title which is to pass, the purchaser acquires the whole right of the vendor in the thing sold: the right to use it, to repair it, and to sell it to others; and second purchasers acquire the rights of the seller, and may do with the article whatever the first purchaser could have lawfully done if he had not parted with it.

*Id.* at 185.

In so holding, the court reasoned that there is a presumption upon sale of a good that the seller intends to part with all of his rights in the thing sold. It would be inconsistent with this presumption, the court found, to allow the seller to subsequently restrict the buyer's use of the product where no restriction was imposed at the time of the sale. *Id.*

Similarly, here, if Sanofi were permitted to impose restrictions upon the resale of its patented product, the expectations of the purchaser would be defeated. The court will therefore not grant to Sanofi an injunction against distribution in this country of the product that it sold in France without restriction. This does not end the matter, however. The Court must still consider whether American Home, the exclusive licensee in the United States, has a right to an injunction. Resolution of this issue re-

quires examination of plaintiffs' second argument, that Sanofi could not waive American Home's right to exclude acepromazine maleate from being brought into this country and sold.

■ As already noted, it is a principle of patent law that the unrestricted sale of a patented article by the owner of the patent conveys to the purchaser the right of unrestricted ownership as against the seller. *Holiday v. Mattheson,* 24 F. 185 (C.C.N.Y. 1885). It is also a principle of patent law, however, that the purchaser does not acquire any rights greater than those possessed by the owner of the patent. *Featherstone v. Ormonde Cycle Company,* 53 F. 110, 111 (C.C.N.Y.1892). In *Featherstone,* the inventor procured patents for his cycle tires in Great Britain and in the United States. The American rights were assigned to plaintiff. The owner of the British patent licensed the defendants to use the tires on their cycles made in Great Britain. Subsequently, defendants sought to sell the tires in the United States. The court, granting an injunction against defendants, stated:

> It is well settled that the unrestricted sale of a patented article by the owner of the patent conveys to the purchaser the right of unrestricted ownership as against the vendor. *But the purchaser does not acquire any right greater than those possessed by the owner of the patent.*

*Id.* (emphasis supplied) (citation omitted). The Court then went on to note that *Boesch v. Graff,* 133 U.S. 697, 10 S.Ct. 378, 33 L.Ed. 787 (1890) was controlling and that the sale of articles in the United States under an American patent could not be affected by foreign laws, except to limit the duration of the patent.

The situation before this court is analogous to that in *Featherstone.* American Home holds an exclusive license to sell the drug acepromazine maleate in this country for veterinary use. Therefore, even the patent holder, Sanofi, would not have the right to sell the drug in this country. True, Sanofi might have been able to sell the drug for some limited non-veterinary pur-

pose, such as for research, but sales made in the quantity at issue in this case could only have been made in violation of the exclusive right to sell the drug possessed by American Home.

Defendants argue that American Home is not entitled to an injunction because the company did not record its rights in the patented product. Under 35 U.S.C. § 261, recordation is required under certain circumstances:

> An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage.

■ Defendants misconceive these recordation requirements. First, neither defendant is a "subsequent purchaser or mortgagee" within the meaning of the statute. Second, although assignments are required to be recorded in order for an assignee to prevail against one who has acquired rights in the patent without notice, *CMS Industries, Inc. v. L.P.S. International, Ltd.,* 643 F.2d 289, 294 (5th Cir.1981), there is no obligation to record a license. *Chambers v. Smith,* 2,582, 5 F.Cas. 426, 427 (C.C.Pa. 1844); *Jones v. Berger,* 58 F. 1006 (C.C.Md. 1893); 4 Deller's Walker on Patents § 401 (2d ed.). Therefore, as noted by the court in *Chambers,* the purchaser of a patent takes subject to outstanding licenses:

> It is the duty of the purchaser to inform himself of the nature of the licensee's ownership and the extent of his right. If he fails to do this, he can not complain that the patentee has misled him, or set up his own remissness to secure to himself a larger interest than was granted to his predecessor in the ownership.

*Chambers v. Smith,* 2,582, 5 F.Cas. 426, 427 (C.C.Pa.1844). See also *Keystone Type Foundry v. Fastpress Company,* 272 F. 242 (2d Cir.1921).

Similarly, a recognized patent treatise notes:

There are no statutory provisions for the recording of licenses or for giving a recorded license any preference or priority over an unrecorded license. However, it is the practice of the Patent Office to record licenses for whatever they may be worth.

*No license is required to be recorded, and no record of a license affects the rights of any person; for a license is good against the world, whether it is recorded or not. A purchaser of a patent takes it subject to all outstanding licenses.*

4 Walker on Patents § 401 (2d ed.) (citations omitted) (emphasis supplied).

■ Because the purchaser is under an obligation to inquire of the seller as to the existence of any outstanding licenses, the purchaser cannot claim that his expectations have been frustrated if he fails to make the necessary inquiry and later discovers that an outstanding license interferes with his right of enjoyment. The purchaser therefore stands in a different position with respect to an unknown licensee of the product than he does to a patentee, where the patentee is the seller.

■ Because defendants took possession of the patented product subject to the outstanding license of American Home, their further argument, that an implied license arose from the sale of the goods by Sanofi, is without foundation. Under the patent law, no formal granting of a license is necessary in order to give it effect. *De Forest Radio Telephone Company v. United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1926). Consequently, where the owner of a patent exhibits conduct from which one dealing with him may properly infer that the owner consents to his use of the patent, an implied license will arise. *Id.*

■ Defendants argue that an implied license has arisen here because Sanofi made its sale of the patented product without restrictions. Where no restrictions are imposed, defendants contend, the rule of *Adams v. Burke,* 84 U.S. 453 (17 Wall.), 21

L.Ed. 700 (1873) applies. In *Adams,* the patentees transferred the exclusive right to make, sell and use their product, coffin lids, to a company in Cambridge, Massachusetts. The exclusive rights were confined to a specific geographic area within Boston. The patentees' remaining rights in the product were transferred to another party. The Boston licensee sold some of the patented coffin lids to an undertaker who made the purchase in Boston but used the lids outside of the area in which the exclusive license applied. Plaintiff, who had the patent rights outside of Boston, claimed that the undertaker was infringing the patent and sought an injunction. Denying the injunction, the Court held:

But, in the essential nature of things, when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its uses and he parts with the right to restrict that use. The article, in the language of the court, passes without the limit of the monopoly. That is to say, the patentee or his assignee having in the act of sale received all of the royalty or consideration which he claims for the use of the purchaser without further restriction on account of the monopoly of the patentees.

Although defendants are correct in stating that sale of an article exhausts the patentees' monopoly in that article, see *United States v. Univis Lens Company,* 316 U.S. 241, 250, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408 (1942), they are incorrect in applying the rule to the facts of this case. The rule has only been applied where the sale is one which the seller had the authority to make in this country. *Compare, Curtiss Aeroplane & Motor Corporation v. United Aircraft Engineering Corporation,* 266 F. 71 (2d Cir.1920) (exhaustion doctrine applied where seller abroad had contractual authority to sell in the United States), *with, Boesch v. Graff,* 133 U.S. 697, 10 S.Ct. 378, 33 L.Ed. 787 (1890) (no exhaustion where seller abroad had no authority to sell in the United States). Sanofi had no authority to sell acepromazine maleate for veterinary purposes in the United States. Although

the sale was consummated abroad, this country's patent laws were not implicated until the product was brought into this country. *Id.* Once the product entered and was sold in the United States for veterinary purposes, it was American Home's interest that was directly affected. Only American Home had the right to sell here for veterinary purposes, not Sanofi.[2] If the court were to hold that Sanofi's sale of the product exhausted the patent, it would be crediting Sanofi with greater rights than the patentee actually had. Sanofi had no right to allow its product to enter this country without the permission of its exclusive licensee. Sanofi could have protected itself by imposing written restrictions upon the sale but chose not to do so. Therefore, Sanofi might be liable to American Home or to defendants for its omissions. In no event, however, would Sanofi's inaction deprive American Home of its rights under the patent. To credit defendants' argument would require this court to conclude that Sanofi could make an unrestricted sale abroad of goods destined for this country without violating the patent laws, yet could not lawfully initiate that same sale within United States borders. Such an anomalous result would discourage the assignment and licensing of patent rights by making those rights less valuable and more susceptible to circumvention through transactions initiated in foreign countries by United States patentees who have previously transferred rights under their patents.

 Even if the Court were to accept defendants' theory that the sale by Sanofi created an implied license to resell in this country, that license would still be subject to outstanding licenses. Where two licenses conflict, the first prevails, "even though the taker of the second had no notice of the existence of the first." 4 Deller's Walker on Patents § 401 (2d ed.); *New York Phonograph Co. v. Edison,* 136 F. 600 (S.D.N.Y. 1905), *aff'd,* 144 F. 404 (2d Cir.1906). Therefore, even if defendants had an implied license from Sanofi, that license would still be subject to that of American Home.

Finally, defendants argue that *Curtiss Aeroplane & Motor Corporation,* 266 F. 71 (2d Cir.1920), controls the outcome of this case. In *Curtiss,* plaintiff owned the United States patent rights for certain airplanes. Plaintiff owned 83% of its subsidiary, which entered into a contract to sell the patented planes to the government of Great Britain. The British government subsequently sold some of the planes to a United States citizen who sought to bring the vehicles into this country. Plaintiff brought suit to enjoin the importation. Refusing to issue an injunction, the court stated:

> If the vendor's patent monopoly consists of foreign and domestic patents, the sale frees the article from the monopoly of both his foreign and his domestic patents, and where there is no restriction in the contract of sale the purchaser acquired the complete title and full right to use and sell the article in any and every country.

*Id.* at 78.

Critical to the Court's ruling was a finding that in plaintiff's contract with the British Government, it was specifically contemplated that the government could dispose of the planes in any way that it deemed appropriate:

> The plaintiff and the British government alike understood and intended that the aeroplanes to be manufactured by that government as well as those to be supplied to it by the plaintiff *were to become the absolute property of the government, and were to be disposed of as the latter should see fit.* The express language of the contract is that the aeroplanes and other articles should '*become and be the absolute property of the British government.*'

*Id.* at 75. (emphasis supplied).

Therefore, unlike here, the seller of the patented merchandise had authority to sell

---

**2.** Although Sanofi advertised in chemical journals in this country that it had acepromazine maleate available for sale, and American Home acquiesced in this apparent violation of its exclusive license, that acquiescence does not constitute a waiver by American Home of its right to pursue other alleged infringers.

in this country. It was only because of that circumstance that the court found the sale to be lawful.

This case, rather than being controlled by *Curtiss,* is analogous to *Daimler Manufacturing Co. v. Conklin,* 170 F. 70 (2d Cir. 1909), another Second Circuit opinion. In *Daimler,* defendant purchased an automobile abroad that contained devices covered by United States patents. The seller had the right to make the sale abroad but had no rights under the United States patents. The court, enjoining the use of the product in this country, found that "the purchaser abroad cannot get any greater right than the patentee from whom he buys." *Id.* at 72. Therefore, because the foreign patentee had no authority to use the product here, the court found that the purchaser also had no such authority.

In light of the foregoing, the court concludes that plaintiff American Home will likely succeed on the merits of its case. In addition, there is indication in the record that the company's business is being damaged by defendants' activities. Not only have the company's sales of acepromazine maleate declined but there is also evidence that other related product lines of the company have also been affected. Furthermore, the court notes that it is likely that third parties will neither be harmed nor the public interest disserved by granting American Home's application for a preliminary injunction. Therefore, its application will be granted. Sanofi's application, however, will be denied because the company has not satisfied the court that it is likely to succeed on the merits of its case. Counsel for plaintiff American Home should submit an order consistent with this opinion.