**DREAMLITE HOLDINGS LTD., Koritza Investment Ltd., Alan Lawson, and Paul Adams, Plaintiffs,**

v.

**Gary S. KRASER and Supercar Ltd., Defendants.**

**No. 88 C 2957.**

United States District Court, E.D. New York.

Oct. 14, 1988.

Curtis, Morris & Safford, P.C., New York City, for plaintiffs (William F. Lawrence, Pasquale A. Razzano and Arnold B. Dompieri, of counsel).

Canetti & Troodler, New York City, for defendants (Isaac S. Canetti, of counsel).

NICKERSON, District Judge.

Plaintiff brought this action asserting claims under the Patent Act, 35 U.S.C. § 1 *et seq.* (1982), and pendent common law claims. The complaint alleges that Gary S. Kraser (Kraser) has infringed or is about to infringe United States Patent No. 4,522,-583 (the Patent), to which plaintiff Dreamlite Holdings Ltd. (Dreamlite) has exclusive rights. The claims of the Patent cover a pocket cigarette lighter in the shape of a miniature automobile.

Plaintiffs moved by order to show cause for a preliminary injunction prohibiting defendants from making, using, or selling any product falling within the claims of the Patent or licensing the Patent to anyone other than plaintiffs.

Kraser holds the Patent, issued June 11, 1985, and corresponding patents or applications for patent filed in several other countries. Early in 1986, he discussed with Paul Adams (Adams) his desire to find a financial backer to help him develop and manufacture the patented lighters. Adams introduced the plan to Lawson. The three of them agreed to form a corporation to carry out Kraser's scheme.

Adams, Kraser, and Lawson formed Dreamlite under the laws of the Island of Jersey about January 9, 1987. Lawson, Adams, and Koritza Investment Ltd. (Koritza), a corporation controlled by Lawson,

are its sole financial backers. Because of his knowledge of the cigarette lighter business, Kraser served as manager of day-to-day operations. He was in charge of coordinating development and production of the lighters.

The parties' relationship was formalized on June 4, 1987, with the execution of a Shareholders Agreement and an Exclusive License Agreement.

The Shareholders Agreement provides that Kraser would receive 30 of the 100 shares in Dreamlite in exchange for granting Dreamlite an exclusive license to the invention covered by the claims of the Patent. Koritza would receive 60 shares in exchange for advancing up to $370,000 to Dreamlite, repayable upon formal written demand after Dreamlite's first financial year. Adams, who had already advanced some money, would receive ten shares.

These shares were not physically delivered to any of the parties. Instead, they were given to a nominee in trust, apparently a common practice in the Island of Jersey to preserve shareholder anonymity. Kraser's shares were delivered to Volaw Trust and Corporate Services Ltd. (Volaw) on January 20, 1987. Although Kraser seems never to have been formally notified of the Trust arrangement as required by paragraph 10 of the Exclusive License Agreement, Dreamlite's and Adam's solicitors discussed the arrangement with Kraser's attorney, who raised no objection to it. The trust instrument gives Kraser full control over the voting and other powers attached to the shares.

The Exclusive License Agreement grants Dreamlite "the sole and exclusive, irrevocable, worldwide right and licence (sic) to make, have made, use and sell the invention covered by the claims of the Patent" in exchange for 30 shares of Dreamlite stock. The Agreement also gives Dreamlite "the exclusive right to defend and enforce the Patent and to prevent infringement of the Patent."

In accordance with these agreements, Kraser negotiated with various third parties for the manufacture of the lighters. Now, however, Kraser claims that these negotiations were on his own behalf. Through defendant Supercar Ltd. (Supercar), a corporation controlled by him, he entered into a licensing agreement with Hirota on March 18, 1988. Plaintiffs fear that he will soon enter into similar agreements with the other companies with which he has dealt on behalf of Dreamlite. Those companies have negotiated exclusively with Kraser and now refuse to deal with other Dreamlite principals.

Kraser spent the $370,000 advanced to Dreamlite without providing an accounting for the funds. In December 1987, he requested more money. Lawson advanced him an additional $60,000 or so in exchange for ten of Kraser's Dreamlite shares. Kraser has still given no accounting for the funds.

The other Dreamlite shareholders became increasingly frustrated with Kraser's refusal either to account for their money or to produce manufacturing and distribution arrangements for the lighter. In April 1988, Lawson became actively involved in the management of Dreamlite. On May 2, 1988, Kraser's attorney informed Dreamlite's solicitors that Kraser regarded the Exclusive License Agreement as a mere "offer" to license. Since Dreamlite failed to "accept" this offer by delivering 30 shares of Dreamlite stock to Kraser, Kraser considered the offer to have lapsed. Prior to this letter, Kraser had never requested physical delivery of the shares. On June 10, 1988, Lawson replaced Kraser as manager, and Kraser was stripped of authority to represent Dreamlite in any capacity.

On July 6, 1988, Kraser's counsel informed plaintiffs that Kraser had transferred his rights under the Patent to Supercar in violation of the Exclusive License Agreement and the Shareholders Agreement. Pursuant to Supercar's agreement with Hirota, 15,000 lighters are on order for delivery into the United States during the Christmas retailing season.

## DISCUSSION

To obtain a preliminary injunction, plaintiffs must show a reasonable likelihood of

success on the merits and irreparable harm if an injunction does not issue. *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed.Cir.1987). To demonstrate a reasonable likelihood of success on the merits, plaintiffs must make a strong showing that they have title to the Patent, that the Patent is valid, and that defendants have infringed it. Additionally, the court must weigh the possibility of harm to other interested parties and the public interest. *Id.*

█ Defendants deny the existence of any sort of licensing arrangement between Kraser and Dreamlite. They claim that the parties had a simple debtor-creditor relationship: Dreamlite lent Kraser approximately $430,000, which Kraser will repay. The Shareholders Agreement is no longer in effect, they claim, because plaintiffs delivered the shares to a trustee instead of to Kraser personally, thereby breaching the contract.

█ Defendants go even farther in refuting the Exclusive License Agreement: They contend that it was simply an "offer" to license that plaintiffs never accepted by delivering the shares. They speculate that the shares must not have been delivered to a trustee on January 20, 1987, because if they had been, the June 4, 1987 Exclusive License Agreement would not have referred to their future delivery. In addition, they argue that there was no "meeting of the minds" as to the license because a supplemental agreement regarding profit-sharing, referred to by Kraser's lawyer in a letter dated June 4, 1987, was never executed.

These arguments are unpersuasive. There has been no showing that the Dreamlite shares were not delivered to Volaw on January 20, 1987. Defendants' speculations as to what the Exclusive License Agreement would have said if they had been delivered are not evidence. The trust instrument grants Kraser full beneficial ownership of the shares. Even if he was not formally notified of the trust arrangement, defendants have not alleged that he attempted to find out where his shares were held, if he did not know, or that he requested their delivery to him personally. Defendants' argument that the Exclusive License Agreement fails for want of consideration is thus meritless. Similarly, defendants have not shown that plaintiffs' delivery of the shares to a trustee, rather than to Kraser personally, was a material breach of the Shareholders Agreement.

Equally spurious is defendants' claim that the parties' failure to execute the supplemental agreement referred to in the June 4, 1987 letter dooms the entire licensing arrangement. In that letter, Kraser's lawyer states that the Shareholders Agreement and the Exclusive License Agreement "are not subject to" the supplemental agreement, and there is no evidence to the contrary.

In finding that Dreamlite holds an exclusive license to the Patent, the court does not rely on a document produced by plaintiffs purporting to be a licensing agreement between Dreamlite and Hirota. Defendants urge vigorously that this document is a fabrication, pointing out that it is dated a year earlier than the date of the alleged agreement and signed by Kraser on behalf of Dreamlite Enterprises Ltd., a different company from Dreamlite. In fact, the signature page appears identical to that in an agreement between Dreamlite Enterprises and Hirota executed on March 19, 1986. Plaintiffs allege that they obtained the contested document from Kraser. The authenticity of this document is questionable, but it is not essential to the determination of the issues before us. The other evidence weighs heavily in plaintiffs' favor.

█ Indeed, the Exclusive License Agreement is not a mere license but an assignment of all the rights of the patentee ("Mr. Kraser hereby grants to Dreamlite the sole and exclusive, irrevocable, worldwide right and license to make, have made, use and sell the invention covered by the claims of the Patent"), and gives Dreamlite "the exclusive right to defend and enforce the Patent and to prevent [its] infringement." Looking to the substance of the agreement rather than its label, *see Waterman v. Mackenzie*, 138 U.S. 252, 256, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891), we

conclude that it gives Dreamlite title to the Patent, *see* 35 U.S.C. § 261, and the right to enforce it against Kraser. Even if Dreamlite were only an exclusive licensee, rather than an assignee, it could sue the patentee for infringement within the area of the license. *Sanofi, S.A. v. Med–Tech Veterinarian Products, Inc.*, 565 F.Supp. 931, 937 (D.N.J.1983); *Research Frontiers, Inc. v. Marks Polarized Corp.*, 290 F.Supp. 725, 727 (E.D.N.Y.1968).

■ The validity of the Patent is presumed. 35 U.S.C. § 282. Defendants do not challenge its validity. Moreover, the doctrine of assignor-estoppel would prevent their doing so. *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224–25 (Fed. Cir.), *cert. dismissed,* —— U.S. ——, 109 S.Ct. 28, 101 L.Ed.2d 978 (1988).

■ The licensing agreement between Supercar and Hirota, executed March 18, 1988, gives Hirota the right to manufacture the invention and Supercar the exclusive right to use and sell the manufactured lighters throughout the world, except in Japan, where Hirota may sell them and pay Supercar a royalty for each unit sold. Any attempt by either Supercar or Hirota to make, use, or sell the invention in the United States under this agreement would clearly infringe Dreamlite's rights under the Patent. Defendants themselves allege that such action is about to be or has already been taken: 15,000 units are on order for delivery in the United States in time for the Christmas season. If the patent has not yet been infringed, it will be in the immediate future.

■ If plaintiffs clearly establish that the Patent is valid and that it is being or about to be infringed, irreparable harm is presumed. *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). Plaintiffs have met that test in this case.

To rebut the presumption of irreparable harm, defendants argue that repayment of the loan from Dreamlite to Kraser will make plaintiffs whole. This argument is premised, however, on defendants' claim that Kraser did not license or assign the Patent to Dreamlite. We have already rejected that claim.

This is a dispute over ownership of a patent. Each party stands to lose the same thing: the right to exclude others from practicing the invention, "the very nature of the patent right." *Smith International, Inc. v. Hughes Tool Co., supra,* at 1581. As between them, the court must choose the party that has shown a far greater likelihood of being able to prove title to the Patent. Since the validity of the Patent is not in issue, defendants' actions cannot benefit the public by exposing an invalid patent. No possible harm to other interested parties has been urged.

Plaintiffs' motion is granted. So ordered.