DYK, Circuit Judge,
dissenting,
with whom Circuit Judge HUGHES, joins.
I respectfully dissent from the majority’s holding that Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700 (Fed.Cir. 1992), and Jazz Photo Corp. v. International Trade Commission, 264 F.3d 1094 (Fed.Cir.2001), remain good law. First, I agree with the government that Mallinck-rodt was wrong when decided, 'and in any event cannot be reconciled with the Supreme Court’s recent decision in Quanta Computer, Inc. v. LG. Electronics, Inc., 553 U.S. 617, 128 S.Ct. 2109, 170 L.Ed.2d 996 (2008). We exceed our role as a subordinate court by declining to follow the explicit domestic exhaustion rule announced by the Supreme Court.
Second, I would -retain Jazz Photo insofar as it holds that a foreign sale does not in all circumstances lead to exhaustion of United States patent rights. But, in my view, a,foreign sale does result in exhaustion if an authorized seller has not explicitly reserved the United States patent lights.
I. Domestic Exhaustion
A
Both here and in Mallinckrodt the pat-entee itself sold the patented , item to the purchaser. In Mallinckrodt, “the device [was] manufactured by [the patent owner], who [sold] it to hospitals as a unitary kit.” 976 F.2d at 702. Here, as the majority recognizes, “Lexmark sells its cartridges ... directly to end users, and [ ] to ‘resellers’ (including wholesalers, dealers, and distributors).” Maj. Op. at 728. Lex-mark’s sales of so-called “Return Program Cartridges” were subject to a single-use/ no-resale restriction that barred the purchaser from reusing the cartridge, or transferring a used cartridge to anyone besides Lexmark. See Maj. Op. at 727 & n. 1. Those sales were authorized by the patent holder and transferred title to the purchaser.
Beginning in the 1850s, the Supreme Court recognized that such authorized sales exhaust the patentee’s patent rights in the items sold. The patentee’s right to exclude under the Patent Act expires with an authorized sale. The question of whether the seller has “authorized” the buyer to use or resell the item is simply irrelevant. The Court’s language is unequivocal:
• “[W]hen the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress..... Contracts in relation to it *775 are regulated by the laws of the State, and are subject to State jurisdiction.”
Bloomer v. McQuewan, 55 U.S. 539, 549-50(1852).
• “[W]hen [patentees]' have made and vended to others to be used one or more of-the things patented, ... they have parted with their exclusive right____By a valid’ sale and purchase the patented machine becomes the private individual property of the purchaser, and is no longer specially protected by- the laws of the United States, but by the laws of the State in which it is situated.... [I]f a person legally acquires a title to that which is the subject of letters patent, ... he may repair it- or improve upon it as he pleases, in the same manner as if dealing with property of any other kind.”
Bloomer v. Millinger, 68 U.S. 340, 350-52 (1863).
• “[W]hen [the’patented article] rightfully passes from the patentee to the purchaser, [it] ceases to be within the limits of the monopoly.”
Mitchell v. Hawley, 83 U.S. 544, 548 (1872).
• “The true ground on which [McQue-wan, Millinger, and Mitchell ] rest is that the sale by a person who has the full right to make, sell, and use such a -machine carries with it the right to the use of that machine to the full extent to which it can be used in! point of time.,.. [I]t is open to the use of the purchaser without further restriction on account of the monopoly of the patentees.”
Adams v. Burke, 84 U.S. 453, 455-56 (1873).
• “[W]hen the patentee ... sells a machine or instrument whose sole value is in its use, he receives the consideration for its use, and parts with the right to restrict that use____ [I]t is open to the use of the purchaser, without further restriction on account of the monopoly of the patentee.... ”
Hobbie v. Jennison, 149 U.S. 355, 361-62 [13 S.Ct 879] (1893).
• “[O]ne who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place.”
Keeler v. Standard Folding Bed Co., 157 U.S. 659, 666 [15 S.Ct. 738] (1895).
• “[B]y virtue of the patent law one who had sold a patented machine and received the price and had thus placed the machine so sold beyond the con-fínes óf the patent law, could not by qualifying restrictions as to use keep under the patent monopoly a subject to which the monopoly no longer applied.”
Bos. Store of Chi. v. Am. Graphophone Co., 246 U.S. 8, 25 [38 S.Ct. 257] (1918).
• “[W]here a patentee makes the patented article, and sells it, he can exercise no future control over what the purchaser may wish to do with the article after his purchase. It has passed beyond the scope of the patentee’s rights.”
United States v. Gen. Elec. Co., 272 U.S. 476, 489 [47 S.Ct. 192] (1926).
• “The first vending of any article manufactured under a patent puts the article beyond the reach of the monopoly which that patent confers.”
United States v. Univis Lens Co., 316 U.S. 241, 252 [62 S.Ct. 1088] (1942).
Thus, by the mid-1850s and continuing for the next century, even before Quanta, the Supreme Court repeatedly held that the authorized sale of a patented article exhausted all of the patentee’s patent rights in that article, and freed the article *776 from any restrictions on use or sale based on the patent laws] Post-sale restrictions were enforceable only as a matter of state contract law.[1]
B
The sole Supreme Court case-- to' depart from that principle, Henry v. A.B. Dick Co., 224 U.S. 1 [32 S.Ct. 364] (1912), was explicitly overruled five years later by Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U.S. 502, 518 [37 S.Ct. 416] (1917). See Quanta, 553 U.S. at 625-26 [128 S.Ct. 2109]. In Henry v. A.B. Dick Co., the A.B. Dick Company sold a rotary mimeograph, and affixed to it a restriction stating that it could only be used with stencil paper, ink, and other supplies made by the patentee. 224 U.S. at 11 [32 S.Ct. 364]. The Supreme Court in A.B. Dick upheld that restriction, and, more broadly, held that [t]he property right to.a patented machine may pass to a purchaser with no right of use, or with only the right to use in a specified way, or at a specified place, or for a specified purpose. The unlimited right of exclusive use which is possessed by and guaranteed to the pat-entee will be granted if the sale be unconditional. But if the right of use be confined by specific restriction, the use not permitted is necessarily reserved to the patentee. If that reserved control of use of the machine be violated, the patent is thereby invaded.
Id. at 24-25, 32 S.Ct. 364 (emphasis added). The Court .reasoned, in part, that the patent owner’s “larger right” of excluding all others from using the patent “embraces the lesser, of permitting others to use upon such terms as the patentee chooses to prescribe.” Id. at 35, 32 S.Ct. 364.
The holding of A.B. Dick, that a patent owner has the right to impose post-sale restrictions under the patent law, provided the purchaser has sufficient “notice that he buys with only a qualified right of use,” id. at 26, 32 S.Ct. 364, is.the same as the panel’s holding in Mallinckrodt and the majority’s holding in this case.
A.B. Dich was quickly overruled in Motion Picture Patents, 243 U.S. at 518, 37 S.Ct. 416, which stands as compelling authority against the majority’s conclusion.[2] There, the licensee-manufacturer sold film projectors subject to an attached notice restricting their use to unpatented films made by the Motion Pictures Patents Company, and other restrictions “not stated in the notice, but which are to be fixed, after sale.” id. at 505-09, 37 S.Ct. 416. When a purchaser 'used the projector to *777 display films made by another company, the Motion Picture Patents Company sued for infringement. Id. at 508, 37 S.Ct. 416. The question was whether the restrictions were enforceable after the sale. The Court rejected the basic rationale of A.B. Dick that, since'the “patentee may withhold his patent altogether from public use, he must logically and necessarily be permitted to impose any conditions which he chooses upon any use which he may allow of it,” id. at 514, 37 S.Ct. 416, and concluded that AB. Dick “must be regarded as overruled,” id. at 518, 37 S.Ct. 416. Instead, the Court reaffirmed that “the right to vend is exhausted by a single, unconditional sale, the article sold being thereby carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put on it.” Id. at 516, 37 S.Ct. 416.
The majority attempts to distinguish Motion Picture Patents, on the ground that it only “held particular restrictions improper ... relying on the 1914 Clayton Act,” but “did not rule that all restrictions on a patentee’s sale were ineffective to preserve the patentee’s patent-law rights.” Maj. Op. at 749. That is not accurate. Motion Picture Patents did not leave behind the remnants of AB. Dick—minus tie-ins and resale price maintenance. To the contrary, the Court in Motion Picture Patents found that “[t]he patent law furnishes no warrant for” the restrictions imposed by the patent owner. 243 U.S. at 516, 37 S.Ct. 416. The passage of the Clayton Act only “confirmed” the Patent Act holding reached in Motion Picture Patents. Id. at 517, 37 S.Ct. 416.
In later cases, the Court characterized Motion Picture Patents as having broadly settled the ineffectiveness of all post-sale restrictions under the patent law. In Boston Store of Chicago v. American Graphophone Co., Motion Picture Patents was viewed as “concerning] whether the monopoly of the patent law can be extended beyond the scope of that law or, in other words, applied to articles after they have gone beyond its reach.” 246 U.S. at 26, 38 S.Ct. 257 (emphasis added). The Court stated that Motion Picture Patents accordingly settled “the general question of the power of the patentee to sell and yet under the guise of license or otherwise to put restrictions which in substance were repugnant to the rights Which necessarily arose from the sale which was made.” Id. at 24, 38 S.Ct. 257. Resting on patent exhaustion principles, Motion Picture Patents “decided that as by virtue of the patent iaw one who had sold a patented machine and received the price, and had thus placed the machine so sold beyond the confines of the patent law, could not by qualifying restrictions as to 'use keep under the patent monopoly a subject to which the monopoly no longer applied.” Id. at 25, 38 S.Ct. 257 (emphasis added).
In Quanta, the Court reiterated the broad patent exhaustion rule and left no room for a resurrection of AB. Dick. LG Electronics (“LG”) owned system and method patents related to computer technology. Quanta, 553 U.S. at 621-22, 128 S.Ct. 2109. LG licensed Intel to manufacture microprocessors and chipsets that used the LG patents,. Id. at 623, 128 S.Ct. 2109. The licensing agreement stipulated that no license was given to Intel’s customers to combine the licensed Intel products with non-Intel- components in ways that practiced the LG patents. Id. A separate master agreement required Intel to provide a notice to its customers ‘ that they were not licensed to practice the LG patents by combining Intel products with non-Intel products. Id. at 623-24, 128 S.Ct. 2109. Quanta purchased microprocessors and chipsets covered by.the LG patents from Intel but combined them with non-Intel products to manufacture computers. *778 LG filed suit against Quanta for patent infringement. Id. at 624, 128 S.Ct. 2109.
The Court found that the Intel products embodied, the LG patents and that Intel had authority to sell its products to Quanta. Id. at 635, 636-37, 128 S.Ct. 2109. It then expansively held that “[t]he authorized sale of an article that substantially embodies a patent exhausts the patent holder’s rights and prevents the patent holder from invoking patent law to control postsale use of the article.” Id. at 638, 128 S.Ct. 2109. Significantly, Quanta described Motion Picture Patents as having “reiterated the rule -that ‘the right to vend is exhausted by a .single, unconditional sale, the article sold being thereby carried outside the monopoly of the patent law and rendered free of: every restriction which the vendor may attempt to put upon it.’ ” 553 U.S. at 626, 128 S.Ct. 2109 (quoting Motion Picture Patents, 243 U.S. at 516, 37 S.Ct. 416).
After Quanta, the Court confirmed again that the “doctriné of patent exhaustion limits a patentee’s right to control what others can do with an article embodying or containing an invention.' Under the doctrine, ‘the initial authorized sale of a patented item terminates all patent rights to that item.’” Bowman v. Monsanto Co., — U.S. —, 133 S.Ct. 1761, 1766, 185 L.Ed.2d 931 (2013) (quoting Quanta, 553 U.S. at 625, 128 S.Ct. 2109).[3]
The patent exhaustion doctrine, as stated by Quanta, admits of no exception. Authorized sales “prevent!] the patent holder from invoking patent law to control postsale use.” Quanta, 553 U.S. at 638, 128 S.Ct. 2109.
Contrary to the majority, Quanta’s reference to an “unconditional sale,” id. at 626, 128 S.Ct. 2109, a reference appearing as well in other exhaustion cases, can hardly be read to contradict the Court’s central holding that post-sale restrictions are unenforceable under the patent laws. The language referring to “conditions” imposed on sale or “unconditional” sales is used in these cases in two different senses. On the one hand, there are cases in which such language is used to denote the existence of post-sale restrictions imposed by the patent holder. A.B. Dick and Motion Picture Patents fall into this category. A.B. Dick stated that exhaustion applied only if the sale was “unconditional[ ],” i.e., free of post-sale restrictions. 224 U.S. at 19, 32 S.Ct. 364. Motion Picture Patents, in overruling A.B. Dick, rejected the notion that a seller could impose “conditions,” i.e., restrictions on post-sale use. 243 U.S. at 514-15, 37 S.Ct. 416. The use of such language in those cases refutes the majority’s theory, since. Motion Picture Patents holds that conditions (i.e., restrictions) are not permissible under the patent laws.
In the' few other cases that use the “unconditional sales” language, the reference to an “unconditional” sale is to a sale in which title passes, not to a sale in which *779 no restrictions are imposed.[4] The contemporaneous understanding of “conditional sale” was - as a security device, i.e., an “agreement to sell upon a condition to be performed.” Harkness v. Russell, 118 U.S. 663, 665, 7 S.Ct. 51, 30 L.Ed. 285 (1886); see also Motion Picture Patents, 243 U.S. at 520-21, 37 S.Ct. 416 (Holmes, J., dissenting) (“[A] conditional sale retaining the title until a future event after delivery has been decided to be lawful again and again by this court.”).[5]
That the use of the term “unconditional” in those cases is not referring to a sale without restrictions is crystal clear from Quanta itself, where the Court stated that Motion Picture Patents “reiterated the rule that ‘the right to vend is exhausted by a single, unconditional sale, the article sold being thereby carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it.’ ” 553 U.S. at 626, 128 S.Ct. 2109 (quoting Motion Picture Patents, 243 U.S. at 516, 37 S.Ct. 416). In other words, a sale with restrictions could nonetheless be an “unconditional” sale in which title passes, with the restrictions invalid under the patent laws because of exhaustion.
C
The rule articulated in the Supreme Court’s cases is consistent with the common law rule against restraints on the use or alienation of chattels, which formed the background of the patent statute. In Kirtsaeng v. John Wiley & Sons, Inc., 133 S.Ct. 1351, 1363 (2013), the Court noted, in the context of copyright law, that the “ ‘first sale’ doctrine is -a common law doctrine” traceable to “the common law’s refusal to permit restraints on the alienation of chattels.” The Court cited Lord Coke’s 17th century observation that
[If] a man be possessed of ... a horse, qr of any other chattel ... and give or sell his whole interest ... therein upon condition that the Donee or Vendee shall not alienfate] the same, the [condition] is voi[d], because his whole interest ... is out of , him, so as he hath no possibility] of a Reverter, and it is against Trade and Traffi[c], and bargaining and contracting betwee[n] man and man____
Id. (quoting 1 Edward Coke, Institutes of the Laws of England § 360, at 223 (1628)). Kirtsaeng concluded that “[a] law that permits a copyright holder to control the resale or other disposition of a chattel once sold is similarly ‘against Trade and -Traf-fi[c], and bargaining and contracting.’ ” 133 S.Ct. at 1363.
, So too a rule permitting a patent holder to enact post-sale restraints would b.e contrary to the general common law. Post-sale restraints would “cast a cloud of uncertainty over every sale,” Tessera, Inc. v. Int’l Trade Comm’n, 646 F.3d 1357, 1370 (Fed.Cir.2011). The Supreme Court has repeatedly instructed us not to ignore traditional legal principles to fashion rules “unique to patent disputes.” eBay Inc. v. *780 MercExchange, L.L.C., 547 U.S. 388, 393, 126 S.Ct. 1837 (2006); see also Global-Tech Appliances, Inc. v. SEB S.A., 131 S.Ct. 2060, 2069 (2011); MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 132 n. 11, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). We should decline to do so here. There is no indication in the patent laws that there should be a special exception for patent holders to the general longstanding common law doctrine that promotes free competition in the resale market and certainty in commercial transactions. Allowing the patent holder to impose conditions on the sale of a patented item would indeed largely eviscerate the exhaustion doctrine, by permitting the imposition of all manner of post-sale restrictions except for tie-ins, price-fixing, and other violations of the patent misuse and antitrust law.
D
The majority’s justifications for refusing to follow Supreme Court authority establishing the exhaustion rule misconceive our role as a subordinate court.
First, the majority characterizes the statement of the exhaustion rule in the Supreme Court cases as mere dictum because in those cases there was either no restriction imposed or the restriction would otherwise violate the antitrust laws.[6] But the cases impose no such qualification on the rule announced. The Supreme Court has repeatedly advised the courts of appeals that our task is to follow the rules proclaimed by the Court, and not to attempt to distinguish Supreme Court cases on their facts. See, e.g., Rivers v. Roadway Express, Inc., 511 U.S. 298, 312, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) (“[O]nce the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law.”); Thurston Motor Lines, Inc. v. Jordan. K. Rand, Ltd., 460 U.S. 533, 534-35, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983) (per curiam) (A court of appeals must not “confus[e] the factual contours of [a Supreme Court decision] for its unmistakable holding” in an .effort to reach a “novel interpretation” of that decision.).
Previously we have faithfully adhered to this rule. See Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1347 (Fed.Cir. 2010) (en banc) (“As a subordinate federal court, we may not so easily dismiss [the Supreme Court’s] statements as dicta but are bound to follow them.”); Stone Container Corp. v. United States, 229 F.3d 1345, 1349-50 (Fed.Cir.2000) (“[W]e do not share the Supreme Court’s latitude in disregarding the language in its own prior opinions.”).[7] We cannot appropriately depart from it here.
*781 Second, the majority relies on 35 U.S.C. §§ 271(a) and 154(a)(1) to suggest that a broad reading of the exhaustion doctrine is inconsistent with statutory language making an act of infringement, inter alia, any use or sale of a patented invention “without authority” of the .patent owner, and providing the patent owner with a “right to exclude.” Maj. Op. at 732, 734.. That reliance is misplaced. Patent exhaustion is a limit on the patentee’s statutory right to control what purchasers can do with an article embodying or containing a patented invention. See Bowman, 133 S.Ct. at 1766 & n. 2 (recognizing that patent exhaustion removes restrictions imposed by §§ 271(a) and 154(a)(1)). The focus of patent exhaustion is not whether the buyer has been expressly or impliedly authorized to sell or use a product in a certain way after the sale. Instead, it begins and ends with an inquiry of whether the seller had authorization to make a sale. The exhaustion doctrine is simply a limit on the scope of the patent monopoly, that is, a limit on the exclusive rights of the patentee. The right to exclude expires (or is “exhausted”) by an authorized sale.[8]
Third, the majority claims that giving full sweep to the articulation of the exhaustion doctrine in Quanta and other cases would be inconsistent with the Supreme Court’s decision in General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 58 S.Ct. 849 (1938), aff’d on reh’g, 305 U.S. 124, 59 S.Ct. 116 (1938). The majority asserts that General Talking Pictures “held that a patentee can preserve its patent rights by authorizing a manufacturing licensee to make and sell a patented article under an otherwise-proper restriction, including a restriction on the buyer’s post-purchase use.” Maj. Op. at 744. The majority suggests-it would be incongruous if “a patentee cannot preserve its patent rights against" uses of a patented article ... if, instead of licensing someone else to make and. sell the article, it chooses to make and sell the article itself.” Id. The majority urges there is “no sound legal basis” for distinguishing restrictions on a purchaser from restrictions on a licensee. Id. at 726.[9]
In General Talking Pictures, a patent owner granted a non-exclusive license to a licensee to manufacture and sell patented sound amplifier products. 304 U.S. at 180, 58 S.Ct. 849. The license contained a field-of-use restriction: the licensee could only -make and sell amplifiers for noncommercial use. Id. Nonetheless, in violation of the license terms, the licensee made and sold the products knowing.that they were to be used in a commercial theater, and the buyer had actual knowledge that the licensee lacked authority to make such a sale. Id. The Court stated the “controlling facts” as, “[t]he patent owner did not sell to petitioner the amplifiers in question *782 or authorize [the licensee] to sell them or any amplifiers for use in theaters or any other commercial use. The sales made by the [licensee] were outside the scope of its license and' not under the patent.” Id. at 180, 58 S.Ct. 849. There had been no authorized first sale, for the- licensee “could not convey to [the ultimate purchaser] what both knew it was not authorized to sell,” and thus both were liable for infringement. Id. at 181-82, 58 S.Ct. 849.
There is nothing anomalous about General Talking Pictures: The Supreme Court ‘ has clearly distinguished between sales and licenses, holding that while a patentee cannot impose post-sale restrictions on an authorized sale, it can impose restrictions on a licensee. See Gen. Elec., 272 U.S. at 489-90, 47 S.Ct. 192; McQuewan, 55 U.S. at 549-50; 6A Donald S. Chisum, Chisum on Patents § 19.04[3][h] (2015).
That the exhaustion' of rights applies only to sales and not licenses was clear in Kirtsaeng, which stated that under the copyright “first sale” doctrine, 17 U.S.C. § 109(a), because many movie theater owners “were lessees, not owners, of their copies [of copyrighted films], ... they (like bailees and other lessees) cannot take advantage of the ‘first sale’ -doctrine.” 133 S.Ct. at 1361.[10]
'Thus, in Quanta, the Court stated that General Talking Pictures “held that exhaustion did not apply because the manufacturer [licensee] had no authority to sell the amplifiers for commercial use.” 553 U.S. at 636, 128 S.Ct. 2109. But Quanta held that where the licensee does have authority to sell, the authorized sale results in exhaustion. In Quanta, Intel, a licensee, did have authority to make sales to purchasers, and “exhaustion turns only on Intel’s own license' to sell products practicing the [patentee’s patents].” Id. at 637, 128 S.Ct. 2109.[11]
The majority makes much of the fact that the sale from the licensee' to the ultimate purchaser in General Talking Pictures did not result in exhaustion. See Maj. Op. at 744-45, 747-49. But this is not surprising. The licensee infringed the patent by its manufacture and sale of the item. The sale of the amplifier by the infringer to the ultimate purchaser was the antithesis of an authorized sale, and it is hardly surprising that ah infringer’s unauthorized sale did not result in exhaustion.
In any evefit, even if there were some tension between the- Supreme Court’s broad statement of the exhaustion rule and General Talking Pictures, it is not our task to ignore Supreme Court rulings as “unjustified]” or “[un]sound” because they are purportedly inconsistent with other Supreme Court cases. The distinction between- restrictions on sales (impermissible) and restrictions on licensees (permissible) exists in the Court’s precedent, and it is not for us to decide if it is a sound distinction. “If a precedent of th[e] Court has direct application in a case,' yet appears to rest on reasons rejected in some other line *783 of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e] Court the prerogative of overruling its own decisions.” Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); see also State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275 (1997) (Even if a Supreme Court precedent contains many “infirmities” and rests upon “wobbly, moth-eaten foundations,” it remains the “Court’s prerogative alone to overrule one of its precedents.”).
Finally, the majority proposes that we should somehow sustain the restriction here because it may be pro-competitive, Exhaustion does not turn on whether a particular post-sale restriction is desirable or undesirable, pro-competitive or anti-competitive, but whether the sale was authorized and the item lias passed beyond the scope of the patent monopoly. In any case, the Court has suggested that a prohibition on resale is “manifestly anti-competitive.” Kirtsaeng, 133 S.Ct. at 1363.[12]
There is, in sum, no colorable basis for the majority’s failure to follow the exhaustion rule for domestic sales as articulated by the Court in Quanta and numerous other cases.\
II. Foreign Exhaustion
The second issue here concerns foreign exhaustion. Lexmark sold patented ink cartridges outside the United States to foreign purchasers. As the majority recognizes, “Lexmark made the foreign sales without communicating a reservation of U.S. patent rights.” Maj. Op. at 754. These were, in other words, authorized sales by the holder of United States patent rights, and the sales of so-called Regular Cartridges did not contain “any sale terms restricting reuse or resale.” Maj. Op. at 727. If those latter sales had been made in the United States, even under the majority’s cramped view of exhaustion, there is no question that the sales would have exhausted Lexmark’s domestic patent rights. The issue is whether the foreign location of the sale should lead to a different result, as we previously held in Jazz Photo, 264 F.3d at 1111.
*784 • Like the majority I .would retain Jazz Photo insofar as it holds that a mere foreign sale does not in all circumstances lead to exhaustion of United States patent rights. But the government argues, and I agree, that the foreign sale should result in exhaustion if the authorized seller does not explicitly reserve its United' States patent rights.
A
Let us first consider the centerpiece of the majority’s holding that there is a doctrinal blanket ban on foreign exhaustion, namely the Supreme Court’s decision in Boesch v. Graff, 133 U.S. 697, 10 S.Ct. 378, 33 L.Ed. 787 (1890). Boesch announced no such blanket ban. It did not even involve an authorized sale by the holder of U,S. patent rights but rather a sale by a third party under a foreign law’s prior use exception.
In that case, a seller in Germany sold patented lamp burners to two individuals, Boesch and Bauer. Id. at 701, 10 S.Ct. 378. The seller was not the U.S. patent holder, or a German patent holder, nor was he even a licensee. Id. Under German law, the seller could make and sell the burners because he had made preparations to manufacture them prior to the filing of the German patent by the holder of the U.S. patent rights. Id.,When Boesch and Bauer imported and sold the lamp burners in the United States, the American assignees sued for infringement. Id. at 698, 10 S.Ct. 378. The Court affirmed the holding of infringement, finding that Boesch’s and Bauer’s sales were “in defiance of the rights [of] patentees under a United States patent.... The sale of articles in the United States under a United States patent cannot be controlled by foreign [ (i.e., German)] laws.” Id. at 703, 10 S.Ct. 378.
Thus Boesch does not apply here because the foreign sales were made by Lex-mark—the U.S. patent rights - holder—itself. The accused, infringer does not rely on foreign law as the source of its authority but the doctrine of exhaustion resulting from an authorized sale by a U.S. rights holder.
Just as Boesch is inapposite, so too is the doctrine of extraterritoriality, reflected in Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 92 S.Ct. 1700 (1972); Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221 (1915); and Brown v. Duchesne, 60 U.S. 183 (1856). See Maj. Op. at 763-64. The question here is not whether the manufacture or use of a patented product wholly outside of the United States is patent infringement under U.S. law, see Deepsouth, 406 U.S. at 527, 92 S.Ct. 1700, or whether foreign law creates a defense to infringement in the United States, see Boesch, 133 U.S. at 703, 10 S.Ct. 378. Rather, the question is whether United States patent law recognizes exhaustion that occurs abroad from an authorized foreign sale by the holder of the U.S. patent rights and without reservation of U.S. rights.[13] The majority itself admits that foreign activity, such as express or implied license, can have an impact on the rights of a United States patent owner. See Maj. Op. at 727.
B
Strikingly, every one of the lower court decisions before Jazz Photo applied exactly the rule for which the government .argues. When the sale was made by an entity hot holding' U.S. pátent rights, as in Boesch, or when the authorized foreign *785 seller clearly reserved U.S. rights, there was no exhaustion. See Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc., 565 F.Supp. 931, 934-35 (D.N.J.1983) (foreign sale not authorized by U.S. exclusive licensee); Griffin v. Keystone Mushroom Farm, Inc., 453 F.Supp. 1283, 1285, 1287 (E.D.Pa.1978) (foreign sale not authorized by U.S. exclusive licensee); Daimler Mfg. Co. v. Conklin, 170 F. 70, 70, *72-73 (2d Cir.1909) (foreign sale was not authorized by U.S. patent holder); see also Dickerson v. Tinling, 84 F. 192, 193 (8th Cir.1897) (foreign sale made with prohibition, on import into and sale within United States); Dickerson v. Matheson, 57 F. 524, 525-26 (2d Cir.1893) (foreign sale with.prohibition on import into United States).
But the cases uniformly recognize or assume that where the foreign sale was made by a seller holding U.S. patent rights without a contractual reservation of U.S. rights, exhaustion occurred as a result of an authorized foreign sale. In Holiday v. Mattheson, 24 F. 185, 185 (C.C.S.D.N.Y. 1885), the U.S. patentee sold its patented article in England “without restriction or conditions” to a first purchaser. A second purchaser obtained the article from the first, and brought the article back to the United States. Id. The circuit court affirmed the trial court’s judgment of nonin-fringement, stating, “[w]hen the owner sells an article without any reservation respecting its use ... the purchaser acquires the whole right of the vendor in .the thing sold.... The presumption arising from such a sale is that the vendor intends to part with all his rights in the thing sold.” Id. In Dickerson v. Matheson, in 1893, the Second Circuit concluded that “[a] purchaser in a -foreign country, of an article patented in that country and also in the United States, from the owner of each patent, or from a licensee under each patent, who purchases without any restrictions ... acquires an unrestricted ownership in the article, and can use or sell it in this country.” 57 F. at 527. Similarly in Dickerson v. Tinling, in 1897, the Eighth Circuit “[c]onced[ed,] [but did Hot' decide,] that one who buys a patented article without restriction in a foreign country from the owner of the-United States patent has the right to use and vend it in this country.” 84 F. at 195. The Second Circuit also found foreign exhaustion in Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp., 266 F. 71 (2d Cir.1920); There, the U.S. patent owner licensed a corporation to build airplanes in Canada.with “no restriction or limitation as to time, or place, or manner of use of the aeroplanes.” Id. at '80. A buyer who purchased the airplanes in Canada and then brought them back to the United States was not liable for infringement. See id. In Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc., in 1983, the district court found exhaustion’because even “assuming that Sanofi had a right to enjoin the reselling of the goods in [the United States], it waived that right by not placing any written restrictions upon the purchaser at the time of sale.” 565 F.Supp. at 938.
This uniform approach, existing well before the 1952 Patent Act and continuing thereafter, strongly supports the government’s position. There is indeed a strong argument that the 1952 Act should be read as adopting these earlier cases. See SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC, 807 F.3d 1311, 1321 (Fed.Cir.2015) (en banc) (well-established doctrine of laches codified by 1952 Patent Act).
C
So too congressional legislation described by the majority, far from contradicting the government’s- approach, con *786 firms it. Each bilateral trade agreement cited by the majority requires preservation of U.S. patent/rights only where the U.S, rights , have been expressly reserved.[14] This is illustrated by the U.S.-Australia agreement, where the patentee’s domestic rights must be preserved “where the pat-entee has placed-restrictions on importation by contract or other means.” United States-Australia Free Trade Agreement, Aus.-U.S., art. 17.9.4, May 18, 2004, KAV 6422 (2005). Likewise the U.S.-Singapore agreement: requires recognition of an action to prevent or redress the unauthorized procurement of a patented pharmaceutical product, including where it was first sold abroad, but only where someone “knows or has > reason to know that' such product is or has been distributed in breach of a contract between the right holder and a licensee.” United States-Singapore Free Trade Agreement, Sing.U.S., art. 16.7.2, May 6, 2003, 42 I.L.M. 1026 (2003). And the U.S.-Morocco agreement permits the United States to limit foreign exhaustion, as it did previously with Australia and Singapore, “to- ’cases where the patent owner has placed restrictions on importation by contract or other means.” United States-Morocco Free Trade Agreement, Morocco-U.S., art. 15.9.4, n. 10, June 15, 2004, 44 I.L.M. 544 (2005).
D
This brings us to the Supreme Court’s decision in Kirtsaeng v. John Wiley & Sons, Inc., 133 S.Ct. 1351 (2013). I agree with the majority that Kirtsaeng does not compel identity between the “first sale” doctrine in copyright and patent exhaustion, due to the differences between copyright and patent law.
But unlike the majority, I think that Kirtsaeng provides significant guidance and cannot be dismissed as simply a copyright case, or as limited to the “first sale” provision of the Copyright Act.[15] The policies that animated Kirtsaeng are in large part applicable to patent exhaustion. The Court emphasized the importance of leaving purchasers free to resell goods to enhance competition in the marketplace. Id. at 1363. The Court found that the “first sale” doctrine “frees- courts from the administrative burden of trying to enforce restrictions upon’ difficult-to-trade, readily movable goods.” Id. The Court also found significant the plea of technology companies, who informed the Court that “automobiles, microwaves, calculators, mobile phonés, tablets, and personal computers contain copyrightable software programs or packaging.” Id. at 1365 (internal quotation marks omitted). “A geographical interpretation [of the ‘first sale’ doctrine] *787 would prevent the resale of, say, a. car, without the permission of the holder of each copyright on each piece of copyrighted automobile software.... Without that permission a foreign car owner could not sell his or her used car.” Id.
Those commercial consequences are equally applicable to patent exhaustion. Automobiles, microwaves, calculators, mobile phones, tablets, and personal computers also contain patented components. To paraphrase, “a geographical interpretation [of patent exhaustion] would prevent the resale of, say, a car, without the permission of the holder of each [patent] on each piece of [patented] automobile [software or hardware]— Without that permission a foreign car owner could not sell his or her used ear.”
Refusing to find presumptive exhaustion by foreign sales would have serious adverse consequences in the patent area, just as in the area of copyright. Technology companies have echoed the concerns in Kirtsaeng and report that “modern devices include components from' dozens—if not hundreds—of suppliers.” Brief for LG Electronics, Inc.,. Dell Inc., Google- Inc., Intel Inc., et al. as Amici Curiae 2. The majority’s rule would require a manufacturer to “trace the patent rights^ of every component it purchases and then negotiate appropriate license arrangements with the component manufacturer (as well as any sub-component manufacturer),” and ultimately “it is consumers who suffer most directly through liigher prices.” Id. at 5, 8. A major retailer informs us that it “often sells patented products that, although genuine, wei’e not purchased directly from the patent holder” and that “[s]ome of those products were first sold outside of the United States.” Brief- for Costco Wholesale Corp. et al. as Amici Curiae at 1. A domestic-only patent exhaustion rule would seriously impair international trade.
Kirtsaeng emphasized the “ever-growing importance of foreign trade to. America,” 133 S.Ct. at 1367, which includes trade not just in artwork and books but also automobiles,. appliances, mobile phones, tablets, and personal computers. The Court concluded:
[T]he fact that harm has proved limited sq far may simply reflect the reluctance of copyright holders so far to assert geographically based resale rights. They may decide differently if the law.is clarified in their favor. Regardless, a copyright law that can work in practice only if unenforced, is not a sound copyright law. It is a law that would create uncertainty, would bring, about selective enforcement, and, if widely unenforced, would breed disrespect for copyright law itself!
Id. at 1366. So too with patent law.
E
Despite these significant policy considerations favoring foreign exhaustion for both copyright and patent, there are significant differences betwéen copyright and patent law that cut the other way. The premis'e of exhaustion is that thé rights holder has been compensated for its efforts. See Univis, 316 U.S. at 251, 62 S.Ct. 1088 (“The reward he was demanded and received is for the article and the invention which it embodies.... He has thus parted with his right to assert the patent monopoly with respect to it—”). In the area of copyright, given the uniform international protection of copyrights, it is reasonable to assume that the rights holder will ‘receive compensation for-a foreign sale. But patent law is different. It is not uniform from country to country. Indeed, there are typically significant differences from country to country. Many countries offer no realistic protection'or'very little protection for items patented under U.S. law. In other words, there is reason to doubt, that the rights holder has been fully compensated *788 for a foreign sale. This suggests an accommodation between the interests of the rights holder and the unsuspecting buyer must be found.
Even the majority recognizes the need for such an accommodation. The majority acknowledges that the law should accommodate the potential of “unintended infringement by buyers of goods in foreign countries who bring them into the United States,” but believes that problem could be solved by the availability of an express or a vague implied license defense. See Maj. Op. at 771, 773-74. That defense provides little comfort, however, because it places the burden on the purchaser to obtain a statement from each patentee of a patented component in a product that it has permission to import the component into the United States, or else prove in court that the circumstances of each patentee’s sale of its component to the manufacturer constituted an implied license to import into the United States. •
In my view, the necessary accommodation between- the interests of the rights holder and the unsuspecting buyer can only be achieved by the government’s proposal to put the burden on the U.S. rights holder to provide notice of a reservation of U.S. rights to the purchaser, an approach supported, by the earlier lower court decisions and legislative action.
In other words, the country-to-country differences in patent laws, and the different economic choices patentees must make as a result, suggest that patentees should be able to reserve their U.S. patent rights when making or authorizing foreign sales.[16] But Kirtsaeng’s policy concerns indicate that that right should not extend to situations where the patentee is silent or unclear. If a patentee wishes to reserve its U.S. rights, it should be required to do so unmistakably. The patentee is in a better position to reserve its rights than the purchaser is to inquire into any reservation. A rule requiring reservation would protect both the interests of the authorized seller and the unsuspecting buyer.
* * * * * *
In conclusion, I would overrule our decision in Mallinckrodt as inconsistent with governing Supreme Court authority and overrule Jazz Photo to the extent that it imposes a blanket ban on foreign exhaustion. I would recognize foreign exhaustion where the U.S. rights holder has not notified the buyer of its. retention of the U.S. patent rights. I respectfully dissent from the majority’s contrary holdings.

. See, e.g., Keeler, 157 U.S. at 666, 15 S.Ct. 738 (“Whether a patentee may protect himself and his assignees by special contracts brought home to the purchasers is not a question before us, and upon which we express no opinion. It is, however, obvious that such a question would arise as a question of contract, and not as one. under' the inherent meaning and effect of the patent laws.”) (emphasis added); see also Quanta, 553 U.S. at 637 n. 7, 128 S.Ct. 2109.

. .Even before Motion Picture Patents, the Court had declined to follow A.B. Dick. The Court had held that a packaging notice that set a minimum retail price for a patented tonic, Bauer & Cie v. O’Donnell, 229 U.S. 1, 8, 33 S.Ct. 616, 57 L.Ed. 1041 (1913), and a purported “License Notice” that operated to fix the price at which phonographs could be resold, Straus v. Victor Talking Mach. Co., 243 U.S. 490, 500-501, 37 S.Ct. 412, 61 L.Ed. 866 (1917), were not enforceable under the patent laws. In Straus, the Court stated that courts "would be perversely blind if they failed to look through such an attempt as [the] 'License Notice' thus plainly is to sell property for a full price, and yet to place restraints upon its further alienation, such as have been hateful to the law from Lord Coke's day to ours, because obnoxious to the public interest.” Id.

. The majority relies on the fact, that the Supreme Court in Quanta did not expressly overrule Mallinckrodt, as urged by both the petitioner and the government. The majority cites no authority for the proposition that the Court’s failure to explicitly overrule circuit authority is an implicit endorsement of that authority. Influential commentators have viewed the Supreme Court’s decision in Quanta as having overruled our .decision in Mallinckrodt. See, e.g., 12 Phillip A. Areeda & Herbert Hovenkanip, Antitrust Law ¶ 2044, at 300 & 301 n. 15 (3d ed. 2012) ("In its Quanta Computer decision the Supreme Court reaffirmed a strong version of the first-sale doctrine, striking down more relaxed Federal Circuit precedent.... To the extent that Mal-linckrodt relaxed the first-sale doctrine, it was overruled by Quanta Computer.... ”).

. Mitchell stated that "where the sale is absolute, and without any conditions, the rule is well settled that” the patentee's rights are exhausted. 83 U.S. at 548; see also Motion Picture Patents, 243 U.S. at 516, 37 S.Ct. 416; In re Paper Bag Cases, 105 U.S. 766, 770-71 (1881) ("The right of the owner of a patented machine, without any conditions attached to his ownership, to continue the use of his machine during an extended term of the patent, is well settled.”).

. See Maj. Op. at 749 ("[Although some language in Univis, like language in other decisions in the area, can be taken out of context ... we do not think it appropriate to give broad effect to language in Univis, taken out of context, to support an otherwise unjustified conclusion here....”).

. See also Nat. Res. Def. Council, Inc. v. Nuclear Regulatory Comm’n, 216 F.3d 1180, 1189 (D.C.Cir.2000) (“[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.”) (quotation marks and citation omitted); Alston v. Redman, 34 F.3d 1237, 1246 (3d Cir.1994) (“Though this passage ... is essentially dicta ... we must consider it with deference, given the High Court’s paramount position in our three-tier system of federal courts, and its limited docket.”) (quotation marks and citation omitted); Hendricks Cty. Rural Elec. Membership Corp. v. N.L.R.B., 627 F.2d 766, 768 n. 1 (7th Cir.1980) (“A dictum in a Supreme Court opinion may be brushed aside by the Supreme Court as dictum when the exact question is later presented, but it cannot be treated lightly by inferior federal courts until disavowed by the Supreme Court.”) (citation omitted), rev'd on other grounds, 454 U.S. 170, 102 S.Ct. 216, 70 L.Ed.2d 323 (1981).

. See, e.g., Quanta, 553 U.S. at 636-38, 128 S.Ct. 2109 (concluding “[t]he authorized sale of an article that substantially embodies a patent exhausts the patent holder’s rights”); Univis, 316 U.S. at 249, 62 S.Ct. 1088 (”[T]he authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold.”); Bos. Store of Chi., 246 U.S. at 25, 38 S.Ct. 257 (Sale “placed the machine so sold beyond the confines of the patent law....”); Mitchell, 83 U.S. at 548 ("[WJhen [the patented article] rightfully passes from the patentee to the purchaser, [it] ceases to be within the limits of the monopoly.”); McQuewan, 55 U.S. at 549 (“[W]hen the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly.”).

. See also Maj. Op. at 735 (“no sound reason”); id. at 736 (“formalistic distinctions of no economic consequence”) (quotation marks and citation omitted); id. at 743 (“no good reason”); id. at 744 (“no basis in the policy of the patent statute”); id. at 745. (“unjustifiably formalistic”).

. Similarly, the Court explained in Mitchell that purchasers "who buy goods from one not the owner, and who does not lawfully represent the owner, however innocent they may be, obtain no property whatever in the goods, as no one can convey ... any better title than he owns, unless the sale is made in market overt, or under circumstances which show that the seller -lawfully represented the owner.” 83 U.S. at 550.

. The Supreme Court has never even decided that an authorized sale by a licensee with a limited license does not exhaust the patentee’s patent rights in the item sold. That question was reserved by the Court in General Talking Pictures. 305 U.S. at 127, 59 S.Ct. 116 (“Nor have we occasion to consider the effect of a ‘licensee’s notice’ which purports to restrict the use of articles lawfully sold.”).

. Id. (stating that “competition, including freedom to resell, can work to" the advantage of the consumer” and noting that “restraints ¡ with ‘manifestly anticompetitive effects’ are per se illegal”) (quoting Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007)).
Even on its own terms, the majority’s view that Lexmark’s post-sale restrictions can be pro-competitive is questionable. The majority posits that Lexmark’s single-use/no-resale restriction may not be inconsistent with the antitrust laws because "non-price vertical restraints are to be judged by a rule of reason.” Maj. Op. at 753. But Lexmark’s single-use/ no-resale restriction imposed on the defendants is not a vertical restraint. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.” Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). A restriction on the defendants’ resale is not a restraint on “firms at different levels of distribution,” as between a manufacturer and.a dealer. The restraint is applied to competitors in the sale of Lexmark ink cartridges. Reconditioned durable ' products compete with new products in the same market. See United States v. Aluminum Co. of Am., 148 F.2d 416, 424-25 (2d Cir.1945) (Hand, J.). And horizontal restraints of trade are ordinarily per se unlawful under the antitrust laws. See Nat’l Collegiate Athletic Ass’n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 100, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); see also 2 Herbert Hovenkamp, Mark D. Janis, Mark A. Lemley, & Christopher R. Leslie, IP and Antitrust § 30.2, at 30-2 (2d ed. Supp. 2010) ("A restraint is ‘horizontal’ when at least two of the relevant participants are (1) actual rivals or (2) would or could be actual rivals but for the restraint.”).

. Foreign law cannot affect, of course, the significance of the reservation of U.S. patent rights. See Boesch, 133 U.S. at 703, 10 S.Ct. 378.

. Even if these trade agreements were to the contrary, the acts implementing each agreement make clear that they cannot override U.S. patent law. See United States-Morocco Free Trade Agreement Implementation Act, Pub.L No. 108-302, § 102, 118 Stat. 1103 (2004) ("No provision of the Agreement, nor the application of any such provision to any person or circumstance, which is inconsistent with any law of the United States shall have effect.... Nothing in this Act shall be construed ... to amend or modify any law of the United States.”); United States-Australia Free Trade Agreement Implementation Act, Pub.L. No. 108-206, § 102, 118 Stat. 919 (2004) ("No provision of the Agreement, nor the application bf any such provision to any person or circumstance, which is inconsistent with any law of the United States shall have effect.”); United States-Singapore Free Trade Agreement Implementation Act, Pub.L. No. 108-78, § 102, 117 Stat. 948 (2003) (same).

. Kirtsaeng recognized that the "first sale” doctrine- "played an important role in American copyright law” even before its first codification by the Copyright Act of 1909, § 41, 35 Stat. 1084. 133 S.Ct. at 1363 (citing Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086 (1908)).

. There, is, significant uniformity and reciprocity in international copyright law, see Kirtsaeng, 133 S.Ct. at 1359-60 (observing that American copyright laws protect “works - ‘first published’ in any one of the nearly 180 nations that, have signed a copyright treaty with the United States”), but as the majority describes, the availability and scope of patent protection differ from country to country. See Maj. Op. at 761-62.